Rex APPLEGATE, Appellant,

v.

TOP ASSOCIATES, INC., Theodore O. Prounis, Appellees.

No. 437, Docket 34143.

United States Court of Appeals,
Second Circuit.

Argued Jan. 13, 1970.

Decided Jan. 30, 1970.

Raymond Rubin, New York City, for appellant.

Edmund T. Delaney, New York City, (Daniel E. Kirsch and Townsend & Lewis, New York City, on the brief), for appellees.

Before KAUFMAN and FEINBERG, Circuit Judges, and LEVET, District Judge.*

---

* Of the Southern District of New York, sitting by designation.

IRVING R. KAUFMAN, Circuit Judge:

On April 5, 1960, plaintiff Rex Applegate's wife Adela and his two children disappeared from their home in Mexico City. Applegate has neither seen nor heard from them for the past ten years. He has enlisted the aid of the Federal Bureau of Investigation, United States embassies throughout the Americas, and a Mexican detective agency, all to no avail. As his persistent and painstaking labors to find his family proved unrewarding and led him to utter frustration, there arose in his mind a suspicion, which ultimately ripened into a belief, that they had fallen victim to foul play. Focusing on individuals unfriendly to him, Applegate came to believe that they were the culprits who had spirited away his wife and children, and that to this day they have continued to confine his family in some unknown region of the wide world.

Convinced that his wife and children had been the innocent pawns in a conspiracy directed against him, in December 1968 Applegate instituted this action, seeking $1,000,000 in damages from those whom he alleged to be the conspirators. As defendants he named Top Associates, Inc., a New York company which, he claimed, had placed two agents in Mexican corporations operated by Applegate; Theodore Prounis, its president; Philip Roetinger, one of the agents allegedly assigned to Applegate's corporations; Janet Graham Leddy Scott, a woman whose association with his wife Applegate had strenuously disapproved; and several "Roe's" and "Doe's" whose roles in the alleged conspiracy were as mysterious as their identities.

Characterizing Applegate's lawsuit as an action for alienation of affections, the defendants responded immediately with a motion to dismiss for failure to state a claim on which relief could be granted.[1] Prounis, the only individual

---

1. The motion to dismiss set forth three alleged bars to the maintenance of the ac-

defendant to be served, also submitted an affidavit denying any connection with any conspiracy to kidnap Applegate's wife.[2] To this affidavit was attached the record of a 1960 Nevada divorce proceeding, in which Adela had received a decree of divorce from Applegate for extreme cruelty and had also been awarded custody of the children. Adela's mother, who had witnessed the divorce proceeding and vouched for its accuracy, also submitted an affidavit, in which she revealed that her daughter had since remarried.

Against this array of documentation, Applegate's sole response was an expression of doubt that his "wife" had ever divorced him and a comment on his "wife's" continuing and inexplicable silence. More than this he did not say, hinting mysteriously that the more detailed facts at his disposal concerned the security of the United States. Goaded by Applegate's reference to his "wife's" silence, the defendants obligingly replied with an affidavit executed by Adela in which she stated flatly that she had left Applegate voluntarily in 1960 because of the extreme indignities he had visited upon her and her children and that since

1960 she had remarried and lived in various unspecified regions of the United States and Mexico. In light of Applegate's shocking accusations it was to be anticipated he would charge that his "wife's" signature was a forgery and that the motives of those who had corroborated her account were highly questionable; this he did. Having received affidavits from both sides, Judge Weinfeld elected to treat the motion to dismiss as one for summary judgment and then proceeded to decide that Applegate had not shown a genuine issue of fact to exist. Accordingly, he granted summary judgment for the defendants.[3]

■ Only at this late juncture, after entry of summary judgment in favor of Top Associates and Prounis, did Applegate see fit to come forward and divulge his account of the alleged facts leading up to his wife's departure.[4] He attempts to excuse this tardiness by urging that the only motion ever placed before the district court was one to dismiss on the face of the complaint. Summary judgment, Applegate maintains, was a rude and unpleasant surprise to him. While we view these protestations of ignorance with some skepticism,[5] we

tion: the Nevada divorce secured by Adela in 1960, the statute of limitations, and New York's abolition of the tort of alienation of affections. We, as did the district court, do not find it necessary to reach these contentions.

2. After the entry of summary judgment in favor of Top Associate and Prounis, defendants Roetinger and Scott consented to accept service and moved to have the complaint dismissed. Their motion is presently pending in the district court.

3. An alternative ground for the district court's decision was that the naming of the various "Doe's" and "Roe's" as defendants constituted an improper joinder of parties in a diversity action. On appeal, Applegate requests leave to amend his complaint to delete the "Doe's" and "Roe's." Since we agree with the district court that there is no genuine factual issue for trial, we need not reach this.

4. Applegate's supplemental affidavit was not before Judge Weinfeld when he granted summary judgment in favor of Top Associates and Prounis. It was submitted in opposition to a later motion to dismiss by defendants Roetinger and Scott. However, Applegate has requested this court to consider on this appeal, the statements contained in the supplemental affidavit, as if it had been timely submitted to Judge Weinfeld.

5. Applegate's actions in the district court suggest he was fully aware that a motion to dismiss for failure to state a claim on which relief could be granted could be treated as a motion for summary judgment. He submitted affidavits in opposition to those of the defendants. In fact, his reference to the national security sounds in the nature of an attempted justification, pursuant to Rule 56(f), for his failure to "present by affidavit facts essential to justify his opposition." Even

shall, in deciding the appeal in this bizarre case, assume that he presented his supplemental affidavit to the district court at the appropriate time, in order to eliminate any claim that appellant was denied a trial because of procedural technicalities.

The tale which unfolds in Applegate's supplemental affidavit is replete with romance, mystery, intrigue, and jealousy. It appears from this document that during the Second World War, Applegate was engaged in military intelligence; indeed, we are told that he is the only living graduate of the Allied "School for Assassins." When an unspecified disability, he goes on, forced his retirement from the armed services in 1945, he resolved to put his training in military intelligence to good use. With the alleged assistance of the United States government, he was installed as head of two Mexican corporations engaged in the Latin American arms traffic.

For a time all went smoothly. But in 1957, four years after his marriage to Adela, he was approached by one Captain Kirten, a man purportedly connected with American intelligence, who asked Applegate to employ two intelligence agents in his corporations to assist in gathering information relating to the traffic in guns. Applegate, "as a retired Military Intelligence Officer and a patriotic American citizen," acceded to the plan. He concluded final arrangements with defendant Prounis, then president of Top Associates, he continues, and shortly thereafter employed defendant Roetinger and one named Haley. But the two probably proved better spies than businessmen, and when their efforts, however valuable to the country, proved utterly worthless to the corporations, Applegate sought their removal.

In fact, says Applegate, Roetinger and Haley were not even effective spies. When in 1960 the United States became deeply interested in learning why guns provided to anto-Castro forces invariably fell into the hands of pro-Castro groups, it was Applegate himself, he states, rather than the two agents, who uncovered the information. The difficulty arose, we are told, because Applegate did not turn this information over to the civilian superiors of the agents he had employed. His first loyalty, he believed, was to military intelligence—a loyalty which he claims proved to be his undoing. Applegate's saga reveals that the information he provided gradually ascended through various levels of military intelligence until it reached the very acme of the governmental structure, where its receipt by President Eisenhower prompted him to reprimand the C.I.A. for failure to perform its assigned tasks. Undeterred, Applegate repeated the performance, and, this time, we are told, he was actually threatened that unless he ceased to disregard the proper lines of authority, he would have some form of injury visited upon him. April 5, 1960, Applegate charges, is the day this threat was carried out. On that fateful day he returned home from a business trip to discover that his wife and children were gone. They had, his maid allegedly informed him, departed in a limousine sent by defendant Janet Graham Leddy Scott, a woman whom Applegate, for reasons we need not stop to detail here, had enjoined his wife to avoid. Inquiries, he says, uncovered the personal effects of his wife and children in the home of Raymond Leddy, the then husband of Janet Scott, but no trace of their persons. Finally, when the marriage of Janet Scott to a high civilian intelligence official followed close upon

---

if it were viewed in this light, the justification would be insufficient. Any reason which Applegate would have had for failing to disclose the "facts" at his disposal would have applied with equal force at the trial and thus he could not pick the time or place in the litigation for the dis-

closures. In this situation, Judge Weinfeld's refusal to allow Applegate to preserve the unraveling of the mystery for a later day was entirely proper. See Engl v. Aetna Life Insurance Co., 139 F.2d 469 (2d Cir. 1943).

Janet's divorce and the sudden death of the official's wife, Applegate asserts all of his suspicions crystallized. The marriage established to his satisfaction connivance between the alleged abductress and those parties who wished to harm him.

We admit to having been fascinated and intrigued by this tale, which could only be matched by an Ian Fleming novel.[6] To avoid summary judgment, however, a plaintiff must do more than whet the curiosity of the court; he must support vague accusation and surmise with concrete particulars. Even viewing Applegate's supplemental affidavit in the most favorable light, we conclude that "there is no genuine issue as to any material fact."

Summary judgment, we have often remarked, is a valuable tool for piercing conclusory allegations and disposing of unsupportable claims prior to trial. See, e.g., American Manufacturers Mutual Ins. Co. v. American Broadcasting—Paramount Theatres, Inc., 388 F.2d 272 (2d Cir.1967); Dressler v. MV Sandpiper, 331 F.2d 130 (2d Cir.1964). However, the tool is as dangerous as it is valuable, and in the past the fear of substituting trial by affidavit for trial by jury has led us to employ it with some timidity. See, e.g., Kern v. Hettinger, 303 F.2d 333 (2d Cir.1962); Arnstein v. Porter, 154 F.2d 464 (2d Cir. 1946). But just as trial by affidavit represents an unjustified diminution of the rights of plaintiffs, neither courts nor defendants should be subjected to trials which can be little more than harassment. The 1963 amendments to Rule 56 granted recognition to the principle that summary judgment should be employed with equal regard to the rights of plaintiffs and defendants by requiring that a party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but his response * * * must set forth specific facts showing that there is a genuine issue for trial." See

Dressler v. MV Sandpiper, 331 F.2d 130, 132–133 (2d Cir.1964) (discussion of intent and effect of 1963 amendments). This requirement is applicable even to cases in which the plaintiff is attempting to unveil a shadowy and elusive conspiracy, see First National Bank v. Cities Service Co., 391 U.S. 253, 289–290, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968) and Applegate has failed to meet it.

The core of the claim set forth in Applegate's complaint was that the defendants had abducted and confined his wife and children. The defendants came forward to rebut this conclusory claim by convincing and apparently reliable documentation. Adela herself stated under oath that she had left Applegate voluntarily because of the extreme physical cruelty, habitual intemperance, consistent financial irresponsibility and long-continued indignities visited upon her by Applegate himself. The decree of the Nevada court supported Adela's claim that she had been driven from her home by the cruelty of Applegate. At this point, it became Applegate's duty to reveal the factual basis of his claim. Fed.R.Civ.P. 56(e). He did not do so; instead, he noted his personal belief that the signature on Adela's affidavit was a forgery and that the plaintiff in the Nevada divorce proceeding was an impersonator. As we have instructed in the past, "The original may have been forged; the authentication may be false * * *. But if a motion for summary judgment is to have any office whatever, it is to put an end to such frivolous possibilities when they are the only answer." De Luca v. Atlantic Refining Co., 176 F.2d 421, 423 (2d Cir.1949) (L. Hand, C. J.), cert. denied, 338 U.S. 943, 70 S.Ct. 423, 94 L.Ed. 581 (1950). In these circumstances, Judge Weinfeld had no choice but to grant summary judgment.

Moreover, we are of the view that Applegate's supplemental affidavit provides no reason to overturn the entry of sum-

6. The late spy novelist was, we learn from the record, one of Applegate's friends.

mary judgment. To prevent the exchange of affidavits on a motion for summary judgment from degenerating into mere elaboration of conclusory pleadings, Rule 56(e) requires "supporting and opposing affidavits [to] be made on personal knowledge [and to] set forth such facts as would be admissible in evidence." Applegate, however, has submitted an affidavit grounded on suspicion, and bound together with rumor and hearsay. He has provided the court with the characters and plot line for a novel of intrigue rather than the concrete particulars which would entitle him to a trial. He has no personal knowledge of many of the events recounted in the affidavit, most notably of those most closely associated with the departure of his wife.

■ Furthermore, in order to withstand a motion for summary judgment the facts placed in issue must be material. Much of Applegate's affidavit is devoted to setting forth his disagreements with the CIA. While these bickerings and disputes do tend to establish a motive on the part of the alleged conspirators to harm Applegate, they are largely irrelevancies, fascinating indeed, yet irrelevancies nonetheless. On the crucial issue whether his wife was forcibly abducted or departed voluntarily, Applegate provides only a single hearsay particular—a telephone call from Janet Scott to his wife on April 5, 1960 informing her that she and her children would be collected in a limousine to attend an embassy function. Applegate has no personal knowledge or corroborative evidence of this alleged conversation; moreover, it is in no way inconsistent with a voluntary departure on that date. Accepting the truth of all the "facts" alleged in the supplemental affidavit, the plaintiff's case could not at a trial withstand a motion for a directed verdict. See Sartor v. Arkansas Natural Gas Corp., 321 U.S. 620, 64 S.Ct. 724, 88 L.Ed. 967 (1944); Empire Electronics Co. v. United States, 311 F.2d 175 (2d Cir.1962). We therefore affirm the grant of summary judgment.