In re Perri KANTERMAN, Debtor.

Alvin GALLANT and Joan Gallant, Plaintiffs,

v.

Perri KANTERMAN, Donald Kanterman, First Inter–County Bank of New York, Arnold I. Biegen, Marchi Jaffe Steinberg Crystal Katz & Burke, and Joseph G. Blum, in his capacity as temporary receiver of Gallant Securities, Inc. and Gallant Intercapital Corp., Defendants.

Bankruptcy No. 87 B 12318 (HCB).
Adv. No. 88–5235A.

United States Bankruptcy Court, S.D. New York.

March 13, 1989.

Leave to Appeal Granted May 18, 1989.*

See also, D.C., 88 B.R. 26.

---

* See 99 B.R. 208.

Gross & Novak, P.A. by Timothy O'Neill, East Brunswick, N.J., for defendant Federal Deposit Ins. Corp.

Shaw, Licitra, Eisenberg, Esernio & Schwartz, P.C., by Peter T. Neill, Garden City, N.Y., for defendant trustee.

Richard W. Meirowitz, New York City, for plaintiffs Gallant.

Parker Chapin Flattau & Klimpl, by Joel Lewittes, Ross Rhodes, New York City, for defendant Arnold I. Biegen.

## DECISION

**HOWARD C. BUSCHMAN, III,**
Bankruptcy Judge.

The Federal Deposit Insurance Corporation (the "FDIC") seeks summary judgment on the fourth, sixth and seventh cross-claims contained in the Chapter 7 Trustee's third amended answer to the complaint in this adversary proceeding alleging fraudulent conveyances. Those cross-claims assert that a conveyance by the Debtor, Perri Kanterman, of a mortgage and her entering into a mortgage note are avoidable as fraudulent transfers pursuant to § 544(b) of the Bankruptcy Code and N.Y. Debtor and Creditor Law § 270 *et seq.* (McKinney's 1988). Since there are genuine issues of material fact to be tried, summary judgment is denied.

### I

The undisputed factual circumstances involved in this adversary proceeding involve interrelated parties and transactions among them. A brief description of the parties involved is necessary to an understanding of the web of activities which have led to the dispute before us.

We begin with the Debtor, Perri Kanterman, a housewife and the owner of real property, including a house and land in the Hamlet of Remsenburg in the Town of Southampton in Suffolk County, New York (the "Remsenburg Property"). It was this realty that was later mortgaged. The mortgage and mortgage note are the subject of the dispute before us in this adversary proceeding.

Perri Kanterman's husband, Donald Kanterman, was Chairman of the Board of Gallant Securities, Inc. ("G.S.I."), a nonclearing securities broker and underwriter located in Manhattan. Donald Kanterman was one of two stockholders in G.S.I., the other being Alvin Gallant, President of G.S.I. Affidavit of Susan Schutz, Assistant to the Chairman of the Board, Bookkeeper and Controller ("Susan Schutz Affidavit"). Apparently, Perri Kanterman was also employed by G.S.I. *Id.* ¶ 2.

Gallant was a principal and served as president of G.S.I. until September 19, 1986 when he resigned. Affidavit of Alvin Gallant ¶ 4 ("Gallant Affidavit"). He instituted an action against G.S.I. and the Kantermans on or about October 14, 1986 asserting claims for, *inter alia* money lent, account stated, breach of contract, unjust enrichment and the appointment of a temporary receiver. *Alvin Gallant v. Donald Kanterman, et al.,* Supreme Court of the State of New York, County of New York, Index No. 23740/86. As a result of that action, on January 27, 1987, a temporary receiver was appointed for G.S.I. Gallant Affidavit ¶¶ 4, 6.

In or about June of 1986, G.S.I. required temporary funds as a result of certain delays in receiving revenues which were to be generated from some of its underwritings. Susan Schutz Affidavit ¶ 2. Donald Kanterman and Alvin Gallant asked Arnold J. Biegen, an attorney and friend of Donald Kanterman's, to facilitate Gallant's obtaining a loan from First Inter–County Bank of New York ("FICB"), a bank with whom G.S.I. had previously done business. *Ibid.*

In the summer of 1986, Biegen, acting as counsel for G.S.I., entered into an arrangement with FICB whereby Biegen would borrow $265,000 from FICB, re-lend those funds to G.S.I. and use the remainder to pay an antecedent debt owed by G.S.I. to Biegen. Affidavit of Arnold Biegen, dated Nov. 25, 1988 ¶¶ 10–23. Apparently in view of G.S.I.'s financial condition, Memorandum to FICB's Credit Committee by James Hurtig dated October 20, 1986 (the "Hurtig Memorandum"), FICB was willing to extend a loan only directly to Biegen, the cash proceeds of which would go to G.S.I. Biegen Affidavit of 10/14/88 ¶ 12.

The loan transactions between FICB and Biegen progressed as follows. On August 6, 1986, FICB approved an unsecured loan to Biegen in the amount of $65,000 and issued a cashier's check payable to Biegen in that amount. Affidavit of David M. Cohen In Support of Motion for Summary Judgment, Exhibits 5 and 6. ("Cohen Affidavit"). On August 13, 1986, FICB approved an unsecured loan to Biegen in the

amount of $165,000. Cohen Affidavit, Exhibit 8. In order to pay off the August 6 loan, plus interest, FICB issued an advice of charge in the amount of $65,338.54. Cohen Affidavit, Exhibit 9. Biegen, therefore, was indebted to FICB in the amount of $165,000 in August of 1986. On October 22, 1986, FICB approved a $265,000 loan to Biegen, as a cap and inclusive of the prior two loans. Cohen Affidavit, Exhibits 12 and 13.

Although Biegen apparently thought that FICB had agreed to make the loan without security, FICB demanded collateral in October 1986. Biegen Affidavit of Nov. 25, 1988 ¶ 18, Affidavit of James Hurtig ¶ 2 ("Hurtig Affidavit"). Biegen then offerred to obtain a mortgage on the Debtor's Remsenburg Property and assign it to FICB. Accordingly, the loan was conditioned on (i) Biegen's obtaining a life insurance policy for the amount of his indebtedness to FICB with FICB named as beneficiary, (ii) his assignment to FICB of a second mortgage on the Debtor's Remsenburg Property and (iii) a letter acknowledging his direct responsibility for the debt. Cohen Affidavit Exhibit 12. FICB's vice president recommended that FICB lend Biegen an additional $100,000, and it was stated:

> Mr. Biegen has asked to borrow an additional $100M on a personal basis to help Gallant's interim working capital needs ... To secure his position, Mr. Biegen is taking a second mortgage on Peri [sic] Kanterman's $800M East [sic] Hampton home. He will assign it to us as support for his debts.

Hurtig Memorandum. The FICB Credit Committee approved the loan on October 22, 1986. The minutes of that date recorded:

> # 147 Arnold Biegen
> Approved: $100M increase in unsecured loan to new total $265M. Rate: prime + 2-½%. Life insurance policy on him naming FICB as beneficiary for $300M, assignment of a second mortgage on a residence and a letter of understanding to be given as additional support. Documents to be reviewed by counsel. Proceeds to be re-loaned

to Gallant Securities. Repayment to come as Gallant repays or [from] Biegen's cash flow. J. Hurtig Memo 10/20.

FICB issued an Advice of Credit to Biegen in the amount of $265,000, Cohen Affidavit, Exhibit 14, and an advice of charge in the amount of $167,048.75 to pay off the August 15, 1986 loan plus interest on November 5, 1986. Cohen Affidavit, Exhibits 16, 17, 18. Biegen, therefore, ended up being indebted to FICB in the amount of $265,000 on November 5, 1986. He executed a note on that day in favor of FICB in the amount of $265,000. Cohen Affidavit, Exhibit 1.

Seven days prior to Biegen's execution of his note to FICB, a mortgage on the Remsenburg Property and mortgage note, both dated October 29, 1986, were executed by Perri Kanterman in favor of Biegen in the amount of $265,000. These documents were assigned from Biegen to FICB on November 3, 1986, Cohen Affidavit, Exhibit 4. The mortgage was not recorded prior to its being assigned.

It further appears that FICB was initially requested to loan $350,000. Susan Schutz Affidavit ¶ 6. A mortgage, mortgage note and assignment reflecting those amounts were prepared only to be changed when FICB refused to loan more than $265,000. Biegen Affidavit of Jan. 12, 1989 ¶ 1.

In January 1987, G.S.I.'s check in the amount of $2,870.83 for interest plus late charges on the $265,000 loan was returned twice for insufficient funds. Affidavit of Arnold I. Biegen dated Oct. 14, 1988, Exhibit I. On or about March 11, 1987, FICB made demand on Biegen for payment of the $265,000 principal of his note plus accrued interest. Biegen Affidavit of 10/14/88, Exhibit J. He then made demand on Perri Kanterman for payment of the $265,000 principal of the mortgage and mortgage note plus accrued interest. Biegen Affidavit of 10/14/88, Exhibit K. No payment was made pursuant to such demand. Biegen Affidavit of 10/14/88 ¶ 9.

FICB instituted foreclosure proceedings against the Remsenburg Property on or about May 5, 1987. FICB annexed to its

foreclosure complaint a copy of a purported mortgage note in the amount of $350,000, which was the amount of the loan originally contemplated by G.S.I. Apparently, no one at the bank questioned why a $265,000 mortgage was accompanied by a $350,000 mortgage note, when the mortgage itself plainly stated that payment should be made according to the terms of the note which cross-referenced the mortgage. As a result, Perri Kanterman answered FICB's complaint by denying liability on the loan and asserting as an affirmative defense that the mortgage was usurious. Biegen Affidavit of 11/25/88 ¶ 31. FICB admitted its error in October 1987 and indicated that it intended to amend its complaint to correct the mistaken allegation in regard to the $350,000 mortgage note. Affirmation of Suzanne Antippas, counsel for FICB, ¶¶ 7, 8 (the "Antippas Affirmation").

An action was also commenced by FICB against Biegen personally on Nov. 23 1987 to recover the $265,000 based upon the promissory note signed by Biegen. *See* Cohen Affidavit, Exhibit 2. That action was subsequently consolidated with the foreclosure action. The consolidated action has been stayed upon the filing of the Debtor's bankruptcy petition.

Perri Kanterman filed with this court a voluntary petition under Chapter 11 of Title 11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code" or the "Code") on or about November 27, 1987. The Chapter 11 case was converted to a case under Chapter 7 of the Bankruptcy Code by order of this Court dated February 19, 1988. FICB was closed by the Superintendent of Banks for the State of New York on March 11, 1988 and the FDIC was appointed receiver. Cohen Affidavit ¶ 2. Failing to find the mortgage and mortgage note at FICB, the FDIC obtained them from Biegen's counsel on May 17, 1988 and holds them in its capacity as a receiver. *Id.* ¶ 13. The FDIC does not allege that it, in its corporate capacity, purchased the mortgage and mortgage note from the receivership.

### The Trustee's Cross Claims Against FDIC

In her Fourth Cross Claim, the Trustee asserts that the mortgage and mortgage note are voidable under the N.Y. Debtor and Creditor Law § 270 *et seq.* (McKinney 1988) in that the mortgage was conveyed and the note was given by the Debtor for a lack of fair consideration and that the Debtor, by signing the mortgage note and conveying the mortgage, was rendered insolvent.[1]

The Trustee's Fifth Cross Claim, alleging that the transaction was usurious, has been withdrawn.[2]

In her Sixth Cross Claim, the Trustee asserts that the Debtor conveyed the mortgage with the actual intent to defraud creditors. The Seventh Cross Claim asserts that Biegen knew or should have known

1. Sections 270 *et seq.* of the New York Debtor and Creditor Law contain the New York codification of the Uniform Fraudulent Conveyance Act. Section 276 provides that transfers made and obligations incurred with actual intent to hinder, delay or defraud present or future creditors are fraudulent as to those creditors. Sections 273 and 275 provide that transfers made and obligations incurred without fair consideration are constructively fraudulent regardless of intent if the debtor is insolvent or was thereby rendered insolvent (§ 273) or if the debtor intends or believes that he or she will incur debts beyond his or her ability to pay as they mature (§ 275). Fair consideration is defined in § 272 as either an exchange of a fair equivalent in good faith for the property conveyed or obligation incurred or receipt of property in good faith to secure a present advance or antecedent debt in an amount not disproportionately small as compared with the value of the property.

2. The Trustee's Third Amended Answer contains two counterclaims and cross-claims alleging usury. By letter dated February 15, 1989, the Trustee consented to dismissal of both the first and fifth cross-claims.

In a reply letter dated February 21, 1989 counsel for Biegen requested that (i) the usury counts should be dismissed with prejudice and (ii) that the court, in accordance with Bankruptcy Rule 9011, should assess sanctions against Trustee's counsel for asserting the usury claim in the Third Amended Answer since such claim was not grounded in fact or warranted by existing law. The dismissal of the usury counts will be with prejudice. The request under Rule 9011 is denied without prejudice to renewal after trial.

that the Debtor was insolvent when she conveyed the mortgage or that the conveyance of the mortgage rendered her insolvent.

None of the factual predicates of the fourth, sixth and seventh cross-claims are disputed by FDIC on this motion. In arguing that the Trustee cannot avoid the mortgage note and mortgage as a fraudulent conveyance, the FDIC does not assert grounds based on the N.Y. Debtor and Creditor Law § 270 *et seq.* Rather, it asserts that the Trustee is precluded by federal law from seeking to avoid the FDIC's interest in the mortgage and mortgage note.

The FDIC also asserts that, even were the transfer to be avoided, FICB is a secondary transferee under 11 U.S.C. § 550(a)(2) who gave value and acted in good faith and without knowledge under 11 U.S.C. § 550(b)(1). It, therefore, argues that the property transferred, *i.e.* the mortgage lien, cannot be recovered from the FDIC as receiver for FICB.

Thirdly, the FDIC asserts that FICB was a holder in due course of the mortgage note and, therefore, that obligation of the Debtor cannot be avoided.

## II

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment should be granted "if the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The standard for ruling on a summary judgment motion is similar to that of a directed verdict—the court must grant the motion if under the governing law there can be but one reasonable conclusion. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265, 274 (1986). The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue as to any *material*

fact." *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 211 (1986) (emphasis in original).

The court's function when ruling upon a motion for summary judgment is not to determine the truth of the allegations but to determine whether there is a genuine issue of material fact. *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510. The evidence to be produced by the non-moving party to show the existence of a genuine dispute of material fact need not be "in a form that would be admissible at trial in order to avoid summary judgment." *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553. The court should afford the non-moving party the benefit of reasonable inferences, *American Manufacturers Mutual Insurance Co. v. American Broadcasting–Paramount Theatres, Inc.,* 388 F.2d 272, 279 (2d Cir.1967), *cert. denied,* 404 U.S. 1063, 92 S.Ct. 737, 30 L.Ed.2d 752 (1972) for such fall with the considerations applicable to a motion for a directed verdict. 9 C. Wright & A. Miller, Federal Practice and Procedure § 2528 (1971).

Ultimately, the court's role on a motion for summary judgment is to determine, in light of these standards, "whether there is a genuine need for a trial." Fed.R.Civ.P. 56 Advisory Committee Note (1963 Amendments). Here there is such a genuine need. The facts genuinely disputed are highly material and concern key issues to this proceeding.

## III

Seeking to avoid those issues, the FDIC, in its supplemental brief, asserts that, as a matter of law and regardless of whether the elements of a fraudulent transfer can be proven in this proceeding, the Trustee's attempt to avoid the mortgage lien and mortgage note cannot stand in light of *D'Oench, Duhme & Co., Inc. v. FDIC,* 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942) and its progeny. It is argued that the fraudulent nature of the transaction is a non-assertable part of a secret agreement

and that the FDIC has the status of a holder in due course.[3]

In *D'Oench*, the Supreme Court held that an accommodation maker of a note given to a bank was estopped from asserting against the FDIC that the note was given without consideration and upon an understanding that it would not be enforced. Referring to "a federal policy to protect [the FDIC], and the public funds it administers, from misrepresentations made to induce or influence the action of the [FDIC], including misstatements as to the genuineness or integrity of securities in the portfolio of the banks which it insures or to which it makes loans," 315 U.S. at 459, 62 S.Ct. at 680, the Court held that the secret agreement not to enforce could not be asserted. It ruled:

> The test is whether the note was designed to deceive the creditors or the public authority, or would have that effect. It would be sufficient in this type of case that the maker lent himself to a scheme or arrangement whereby the banking authority on which [the FDIC]

relied in insuring the bank was or was likely to be misled.

315 U.S. at 460, 62 S.Ct. at 681.

■ Congress subsequently codified and expanded *D'Oench* in § 2[13] (e) of the Federal Deposit Insurance Act of 1950, 12 U.S.C. § 1823(e). That statute, as amended, invalidates secret agreements tending to defeat the right, title or interest of the FDIC in any asset acquired by it as either security for a loan or by a purchase and assumption transaction.[4] Section 1823(e), however, does not apply in a case such as this where the FDIC sues, not as a purchaser in a purchase and assumption transaction[5] but, as receiver. *FDIC v. McClanahan*, 795 F.2d 512, 516 (5th Cir.1986).

The issue before us is thus whether, under *D'Oench*, a bankruptcy trustee acting under § 544(b) of the Bankruptcy Code, 11 U.S.C. § 544(b),[6] is precluded from setting aside a transfer of an interest in property of a debtor and the incurrence of an obligation by a debtor as fraudulent conveyances under applicable state law. As an

---

**3.** In its reply papers, the FDIC originally raised the *D'Oench* line of cases in response to an unpleaded assertion by the Trustee, supported by plaintiffs, that Biegen was fraudulently induced by FICB to enter into the loan. Since that allegation of fraudulent inducement has not been pleaded by the Trustee, it is not an issue in this proceeding.

**4.** Section 1823(e), after authorizing the FDIC to make secured loans to insured banks and enter into purchase and assumption transactions, provides:

> No agreement which tends to diminish or defeat the right, title or interest of the Corporation in any asset acquired by it under this section, either as security for a loan or by purchase, shall be valid against the Corporation unless such agreement (1) shall be in writing, (2) shall have been executed by the bank and the person or persons claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the bank, (3) shall have been approved by the board of directors of the the bank or its loan committee, which approval shall be reflected in the minutes of said board or committee, and (4) shall have been, continuously, from the time of its execution, an official record of the bank.

12 U.S.C. § 1823(e).

**5.** Purchase and assumption transactions and the reasons for them are described in *Gunter v.*

*Hutcheson*, 674 F.2d 862 (11th Cir.), *cert. den.*, 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982). Briefly, as insurer of bank accounts below a set amount, the FDIC has two ways of achieving payment of depositors of a failed bank. It can either liquidate the assets, pay depositors their deposits and make up any shortfall with insured funds or it can enter into a purchase and assumption transaction. In such a transaction, the FDIC as receiver, see 12 U.S.C. § 1821(c), arranges for a corporation to purchase the failed bank and its assets of high banking quality and assume its liabilities. Those assets not purchased are returned to the FDIC as receiver. The FDIC as insurer purchases the returned assets from itself as receiver and as receiver it transfers that sum to the purchasing bank. The FDIC as insurer and owner of those assets then attempts to collect thereon to reduce the loss to the insurance fund. *Gunter*, 674 F.2d at 865; *see also FDIC v. Wood*, 758 F.2d 156, 160–61 (6th Cir.1985).

**6.** Section 544(b) provides:

> The trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under Section 502 of this title or that is not allowable only under Section 502(e) of this title.

Section 502(e) refers to certain claims for reimbursement or contribution.

issue of first impression, it requires consideration of the contours of *D'Oench* and its progeny.

In some respects, the law under *D'Oench* and § 1823(e) have developed similarly. Both have been applied countless times to preclude assertion of defenses based on separate secret agreements in actions brought by the FDIC seeking to enforce unconditional notes and guarantees. *Howell v. Continental Credit Corp.*, 655 F.2d 743, 746 (7th Cir.1981) (collecting cases). Such secret agreements include, not only agreements not to collect as in *D'Oench* but also, oral agreements of accord and satisfaction, *FDIC v. Hoover–Morris Enterprises*, 642 F.2d 785 (5th Cir.1981), and separate agreements regarding the loan proceeds. *E.g. FDIC v. Sarvis*, 697 F.Supp. 1161 (D.Colo.1988).

More recently, some courts, not under *D'Oench*, but under federal common law as developed in *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979), have ruled that the strong federal policy of enabling purchase and assumption transactions to be speedily negotiated and concluded is to be encouraged. They hold that, where the FDIC, as part of a purchase and acquisition transaction acquires a note in good faith and without actual knowledge of any defense against the note, it takes the note free of all defenses that would not prevail against a holder in due course. *FDIC v. The Cremona Co.*, 832 F.2d 959, 964 (6th Cir.1987), *cert. denied,* — U.S. —, 108 S.Ct. 1494, 99 L.Ed.2d. 879 (1988); *Gunter v. Hutcheson,* 674 F.2d 862 (11th Cir.), *cert. denied,* 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982); *FDIC v. Rosenthal,* 477 F.Supp. 1223, 1226 (E.D.Wis.1979), *aff'd.,* 631 F.2d 733 (7th Cir.1980). Similar reasoning led the court in *FSLIC v. Murray,* 853 F.2d 1251 (5th Cir.1988) to apply the same rule to notes acquired in similar fashion by the FSLIC. To this, the same circuit, in *Holt v. FDIC (Matter of CTS Truss, Inc.),* 859 F.2d 357, 362 (5th Cir.1988), added *dictum* that the holder in due course status of the FDIC with respect to notes acquired in a purchase and assumption transaction precludes a bankruptcy trustee from seeking to subordinate the FDIC's claim on the basis of misconduct by the failed bank.[7]

These cases, although citing to the policy articulated in *D'Oench,* do not, as noted, stem from *D'Oench.* They are based on the policy that the FDIC should be able to determine quickly whether to enter into a purchase and assumption transaction and to encourage speedy purchase and assumption transactions. It is reasoned that the need for speed requires shielding the FDIC, when it purchases notes in such transactions, principally from defenses of which it had no actual knowledge and which would not be precluded by *D'Oench* or § 1823(e). *See e.g., FDIC v. Wood,* 758 F.2d 156 (6th Cir.), *cert. denied,* 474 U.S. 944, 106 S.Ct. 308, 88 L.Ed.2d 286 (1985). As the court stated in *Gunter,* 674 F.2d at 872–73:

> [B]ecause this rule is based largely on the need for quick decisions by the FDIC regarding the method to best handle a bank failure, the rule applies only when the FDIC acquires a note in the execution of a purchase and assumption transaction. In other, more normal, commercial contexts, we see no reason to relieve the FDIC from the ordinary operation of state law.

*Id.* The equitable subordination precluded in *CTS Truss,* for example, hardly arose out of a secret agreement.

The *D'Oench* doctrine thus has contours limiting its application. *McClanahan,* 795 F.2d at 515. In no case cited to

---

**7.** Whether these cases will ultimately prevail remains to be seen. Although the Eleventh Circuit in *Gunter* adopted the holder in due course rule to preclude a defense of fraud in the inducement, the Supreme Court in *Langley v. FDIC,* 484 U.S. 86, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987) did not adopt such an approach. Rather, it reached the same result by applying a textual analysis of 11 U.S.C. § 1823(e).

In this decision, we do not reach or express any opinion on whether the holder in due course status articulated by the Fifth, Sixth and Eleventh Circuits in purchase and assumption transactions applies in this Circuit or should be applied to defeat the fraudulent conveyance claims of a bankruptcy trustee.

us or that we have been able to find where the FDIC sued on a note solely as receiver, except *McClanahan,* has *D'Oench* been extended beyond arrangements characterized as secret agreements. Furthermore, although the innocence and non-negligence of the party sued on a note or guarantee is irrelevant under § 1823(e),[8] it is relevant under *D'Oench* if that doctrine is to be applied notwithstanding the absence of a secret agreement.

With § 1823(e) inapplicable to actions brought by the FDIC as receiver, the few courts considering the issue have ruled that estoppel, in the absence of a secret agreement, turns on whether the defendant was wholly innocent and not reckless. *Compare, FDIC v. Meo,* 505 F.2d 790 (9th Cir.1974) *with McClanahan.* The roots of that distinction lie in *D'Oench* itself and its holding that a person who lends himself to a scheme likely to mislead banking authorities is estopped. *D'Oench,* 315 U.S. at 460, 62 S.Ct. at 680. In other cases, as Justice Jackson made clear, the FDIC succeeds "only to the rights which the bank itself acquired where ordinary and good faith commercial transactions are involved." *D'Oench,* 315 U.S. at 474, 62 S.Ct. at 687, (Jackson, J. concurring). *Accord, Gunter,* 674 F.2d at 872–73; *FDIC v. Forte,* 109 Misc.2d 546, 440 N.Y.S.2d 500 (Sup.Ct. Nassau Co. 1981).

Accordingly, in *Meo* a purchaser of bank stock, described by the court as "wholly innocent," 505 F.2d at 792, and thus unaware that a stock order had been wrongfully executed by the bank, was not estopped from pleading failure of consideration in defense of an action on his note to the bank. Similarly, one who signs a blank note at the urging of an owner of a bank with the understanding that it will be filled in later with the amount of a loan he never received is to be estopped from pleading lack of consideration because he recklessly lent himself to a transaction likely to deceive banking authorities. *McClanahan,* 795 F.2d 516. In justifying that result, the Fifth Circuit focused on the loss to be borne, when the FDIC sues as receiver, "by the uninsured creditors or depositors of the failed bank." *Ibid.* To this it added that because the defendant was reckless, it was he "rather than the FDIC or the innocent depositors or creditors of the failed bank [who] must bear the consequences of his unfortunate involvement with [the bank's principal]." *Ibid.*

■ In cases where a bankruptcy trustee seeks to recover for all creditors property transferred in fraud of creditors, however, the trustee as creditor representative is wholly innocent. So innocent of the prepetition wrongful conduct of the debtor is a trustee that the doctrine of *in pari delicto,* analogous to the *D'Oench* estoppel doctrine,[9] does not apply to bar a cause of action by a trustee. *Podell & Podell v. Feldman (In re Leasing Consultants Inc.),* 592 F.2d 103, 110 (2d Cir.1979); *Wedtech Corp. v. Nofziger (In re Wedtech Corp.),* 88 B.R. 619 (Bankr.S.D.N.Y.1988). In the usual case, therefore, the policy of preferring the innocent over the reckless runs in favor of both the trustee and the FDIC and does not support estoppel of the trustee.

■ In addition, the instant case of an alleged fraudulent conveyance of a mortgage conveyance and mortgage note through the debtor's failure to receive fair

**8.** The focus under § 1823(e) is merely whether the defense asserted falls within the rubric of "agreement" as that term is there employed. *Langley v. FDIC,* 484 U.S. 86, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987). There, the obligors on a note, collateralized by a mortgage, asserted that the FDIC insured bank had fraudulently misrepresented the amount of acreage in the land they purchased in defense of an action brought on the note. The bank failed and a purchase and assumption transaction was entered into by the FDIC. In barring the defense under § 1823(e), the Supreme Court held that the term "agreement" covered both bona fide and fraudulent representations and warranties. 108 S.Ct. at 402. Per Justice Scalia, the Court emphasized that an "agreement is an agreement" and that "Congress opted for the certainty of the requirements set forth in § 1823(e)," *e.g.* that the agreement be approved by a loan committee. 108 U.S. at 403.

**9.** *See FDIC v. Oehlert,* 252 N.W.2d 728, 730–31 (Iowa 1977) (§ 1823(e) policy is akin to *in pari delicto* since the maker of the note aided in misleading others by lending his name).

consideration and her thereby becoming allegedly insolvent—which are not contested on this motion—can hardly be said to be a secret agreement. Rather, the notion of a constructive fraud on creditors and the consequent avoiding of transfers and obligations arise in law through their first appearance in the Statute of Fraudulent Conveyances, 13 Eliz. ch. 5 (1570) and its repetition and enlargement in the Uniform Fraudulent Conveyance Act which has been adopted in New York. N.Y. Debtor & Creditor Law § 270 *et seq.* The avoidability of transfers by a trustee pursuant to the Bankruptcy Code's avoiding powers is not due to an agreement or a condition to an agreement. *First City Fin. Corp. v. FDIC (In re First City Fin. Corp.)*, 61 B.R. 95, 97 (Bankr.D.N.M.1986) (voidability of a preferential transfer arises under law and is not due to a secret agreement); *LaMancha Aire, Inc. v. FDIC (In re LaMancha Aire, Inc.)*, 41 B.R. 647 (Bankr.S.D.Fla. 1984) (same).

■ In summary, we conclude that the FDIC's reliance on *D'Oench* and its progeny and its assertion of federal holder in due course status are misplaced. In this case involving a mortgage and note held by the FDIC as receiver rather than pursuant to a purchase and assumption transaction, the rule precluding all defenses except those assertable against a holder in due course, as adopted by the Fifth, Sixth and Eleventh Circuits, does not, by its own terms, apply. Here, moreover, there is no secret agreement. The *D'Oench* line of cases cannot be extended in a manner consistent with their reasoning to bar a fraudulent conveyance action by a trustee against the FDIC as receiver. We thus turn to consideration of the FDIC's assertions that it is entitled to summary judgment under § 550(b)(1) of the Bankruptcy Code, 11 U.S.C. § 550(b)(1), and because FICB was a holder in due course under state law.

## IV

Conceding that, if *D'Oench* is inapplicable, it stands in the shoes of the failed bank, the FDIC essentially argues that, while the Trustee may be able to recover against Biegen, as an initial transferee of the alleged fraudulent transfer under § 550(a)(1) of the Code, the Trustee cannot recover from a subsequent transferee, such as FICB, who "takes for value . . ., in good faith, and without knowledge of the voidability of the transfer avoided." 11 U.S.C. § 550(b)(1).

The FDIC thus asserts that it is entitled to summary judgment under § 550(b)(1) on the basis of establishing four factual predicates: (i) the Kanterman mortgage note and mortgage were assigned to FICB; (ii) FICB gave value for the assignment of the Kanterman mortgage note and mortgage; (iii) FICB acted in good faith and (iv) FICB was without knowledge of the voidability of the transfer between Biegen and Kanterman. FDIC Memorandum of Law in Support of Summary Judgment, 6. Under these very standards and within the context of both §§ 550(a) and 550(b) of the Code, however, we find that the evidence presents triable issues of fact precluding the FDIC's motion for summary judgment.

Sections 550(a) and (b) of the Code provide:

(a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section[s] 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—

(1) *the initial transferee of such transfer or the entity for whose benefit such transfer was made;* or

(2) any immediate or mediate transferee of such initial transferee.

(b) The trustee may not recover under section (a)(2) of this section from—

(1) a transferee that takes for value, including satisfaction securing of a present or antecedent debt, *in good faith,* and *without knowledge of the voidability of the transfer avoided;* or

(2) any immediate or mediate good faith transferee of such transferee.

11 U.S.C. § 550(a), (b) (emphasis added).

■ The issues under § 550, therefore, are broader than described by the FDIC.

First, there is the issue of whether FICB is to be categorized as an initial transferee or "the entity for whose benefit such transfer was made." 11 U.S.C. § 550(a)(1). Section 550(a)(1) is generally to be applied literally. *Levitt v. Ingersoll Rand Fin. Corp. (In re V.N. Deprizrio Constr. Co.)*, 86 B.R. 545, 550 (N.D.Ill.1986). *But see e.g. In re Aerco Metals, Inc.*, 60 B.R. 77 (Bankr.N.D.Tex. 1985) (equitable considerations assist to define scope of § 550(a)(1)). At bottom, that section requires that the transfer have been made for the benefit of the entity from whom the Trustee seeks to recover. *Merrill v. Dietz (In re Universal Clearing House Co.)*, 62 B.R. 118, 127 (D.Utah 1986).

In its motion, the FDIC assumes, without discussion, that FICB does not fall under § 550(a)(1). Resolution of that issue is not so clear cut. The affidavits, depositions and FICB records before us clearly demonstrate that there is present at least the factual issue of whether FICB was the "entity for whose benefit" the transfer of the mortgage was made.

There is no question that FICB ultimately received the benefit and there is evidence that the transfer to Biegen was but the first step in a single transaction designed to afford security to FICB. The Hurtig Memorandum states that "[t]o secure his position, Mr. Biegen is taking a second mortgage on Peri [sic] Kanterman's $800M East Hampton [sic] home. He will assign it to us as support for his debts." While the first clause of this sentence would indicate that the purpose of the mortgage was to secure Biegen, the latter portion indicates that that purpose may well have been to secure FICB.

That indication is supported by FICB's conditioning its loan to G.S.I. on Biegen's obtaining the Kanterman mortgage. It is further supported by the evidence that the amounts of the mortgage note and assignment were changed because of FICB's refusal to lend more than $265,000, and by the notion that the Debtor was willing to give a mortgage in order to assist the

company controlled by her husband in obtaining funds from FICB. To this is to be added that Biegen's assignment to FICB was previously agreed to and followed closely on the heels of the conveyance of the mortgage. Biegen's failure to record the mortgage prior to its assignment to FICB also indicates that these events were but a single transaction. If Biegen were not a conduit or was the person for whose benefit the mortgage was given, it would seem that Biegen, a lawyer, would have recorded the mortgage prior to assigning it. There may be other facts adduced at trial that may bear on the issue. But we cannot say, on this record, that there is no genuine issue of material fact regarding FICB being an entity for whose benefit the mortgage was conveyed and the mortgage note was given under § 550(a)(1).

To be sure, the second stage of a transfer looks like a second transfer and the party to that second stage facially appears to be a subsequent transferee. Nevertheless, if the first transfer would not have been made but in contemplation of another previously agreed and nearly contemporaneous transfer, treating each stage as merely steps in a single transfer accords with and gives meaning to Congress' use of the phrase "entity for whose benefit such transfer was made" in § 550(a)(1). In such an instance, the first step is merely preliminary to the second and the first recipient is merely a conduit for the transfer of property. The second recipient is not a truly subsequent transferee. *See Universal Clearing House Co.*, 62 B.R. at 128 n. 10.[10]

Were it assumed that FICB was not "an entity for whose benefit such transfer was made" under § 550(a)(1) and was, therefore, a subsequent transferee under § 550(a)(2), it must be demonstrated that FICB took for value, in good faith and without knowledge of the voidability of the transfer avoided in order to be protected by § 550(b)(1). 124 Cong.Rec. H 11097; S

---

**10.** This scenario differs from the situation where there is clearly an independent transfer and then a retransfer for the benefit of the defendant. In that instance, the defendant is entitled to the protections of § 550(b)(1) since it was the beneficiary of the independent second transfer. *Universal Clearing House Co.*, 62 B.R. at 128 n. 12.

17414 (1978). On this motion, although FICB gave "value" by lending Biegen $265,000, there is a genuine issue of material fact as to whether it made the loan in good faith and without knowledge of the voidability of the transfer between Perri Kanterman and Biegen.

As to the first of these elements,

[t]he phrase "good faith" in [550(b)(2) ] is not defined in any way. The language of the sections comes from § 4–609(b)(1) of the Commission's Report which was filed with Congress in 1973. The notes accompanying that report state that good faith is a familiar phrase and it was best to leave this interpretation to the courts on a case-by-case construction. Good faith has been defined as *solely a question or whether the grantee knew or should have known that he was not trading normally but that on the contrary, the purpose of the trade, so far as the debtor was concerned, was the defrauding of his creditors.*

*Coleman v. Home Savings Ass'n. (In re Coleman),* 21 B.R. 832, 836 (Bankr.S.D. Texas 1982), quoting from 4 L. King, K. Klee, R. Levin & C. Horsky, Collier on Bankruptcy ¶ 550.03 at 550–8 n. 3 (15th ed. 1981) (emphasis added).

Thus, good faith is not limited to lack of actual knowledge of actual fraud. Good faith, as the FDIC concedes, Reply Memorandum in Support of Motion for Summary Judgment at 6–7, also encompasses a lack of knowledge of circumstances requiring further investigation.

Venerable authority has it that the recipient of a voidable transfer may lack good faith if he possessed enough knowledge of the events to induce a reasonable person to investigate.

*Bonded Financial Services v. European American Bank,* 838 F.2d 890, 897–98 (7th Cir.1988); *see also Dokken v. Page,* 147 F. 438 (8th Cir.1906) (bad faith could be found in the knowledge that the debtor is transferring almost all of its assets). Thus, a transferee acts in good faith "if it had no facts before it that would cause a reasonable person to investigate whether the transfer would be avoidable." *Robinson v.*

*Home Savings of America (In re Concord Senior Housing Foundation),* 94 B.R. 180, 183 (Bankr.C.D.Cal.1988).

"Knowledge" of the voidability of the transfer avoided as used in § 550(b)(1) is similarly not defined in the Code. It has been suggested there may be no difference between "good faith" and "without knowledge of the voidability of the transfer" under § 550(b). *See Bonded Financial Services,* 838 F.2d at 897; *see also, Collier* ¶ 550.03[1] p. 550.10 (treating "without knowledge" as a surplusage to the "good faith" standard); V. Countryman, *The Trustee's Recovery in Preference Actions,* 3 Bankr.Dev.J. 449, 475–80 (1986); *Federman v. Falcone (In re Nevada Implement Co.),* 22 B.R. 105, 106 (Bankr.W.D.Mo.1982) ("knowledge" of voidability does not mean complete understanding of all of the facts; some lesser knowledge will do); *contra, Smith v. Mixon,* 788 F.2d 229, 232 (4th Cir.1986) (constructive notice of the recordation of a fraudulent deed of trust was not equal to the "knowledge of the voidability of the transfer avoided.")

The depositions, affidavits and exhibits before us demonstrate that, even if FDIC's burden of demonstrating FICB's good faith is slight as the FDIC argues, citing *First Int'l Bank of Israel Ltd. v. L. Blankenstein & Son, Inc.,* 59 N.Y.2d 436, 444, 465 N.Y.S.2d 888, 452 N.E.2d 1216 (1983), there are triable issues of fact.

Although a former officer of FICB has averred that he and other bank officials knew nothing that would have led them to investigate whether the transaction was fraudulent, Hurtig Affidavit ¶ 8, there are facts that speak to the contrary. For example, the Hurtig Memorandum suggests that the Debtor was not receiving any consideration for conveying the mortgage or agreeing to pay $265,000. It implies that the Debtor was giving the mortgage to Biegen and incurring the debt to facilitate the loan by FICB to Biegen and indirectly to G.S.I. One would think that a reasonable person, in light of that information would have made an investigation. Trial will determine if in light of all the facts, that conclusion is warranted. In addition,

if FICB had investigated whether the Debtor received any consideration for the mortgage and mortgage note, there is a triable issue of fact as to whether that investigation would have revealed the status of financial affairs of a Debtor whose income, if any, and assets are not reflected in the FICB records before us on this motion.

The FDIC stresses that the mortgage note states "For Value Received." But the receipt of some value such as the contractual consideration of a peppercorn is not fair consideration as defined in § 272. That section speaks of "fair equivalent" and "amount not disproportionately small as compared to the value of the property [conveyed]." N.Y. Debtor & Creditor Law § 272; *cf. Rubin v. Manufacturers Hanover Trust Co.*, 661 F.2d 979, 991–92 (approximate value in exchange required for consideration to be fair under § 67(d) of the former Bankruptcy Act, 11 U.S.C. § 107(d) (repealed)).

Under §§ 550(a)(1) and (b)(1), therefore, the nature of the transaction(s) and the factual circumstances under which FICB received the mortgage and mortgage note do far more than merely whet the curiosity of the court, *Applegate v. Top Associates*, 425 F.2d 92, 96 (2d Cir.1970); *see also Schering Corp. v. Home Ins. Co.*, 712 F.2d 4 (2d Cir.1983); *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438 (2d Cir. 1980); they demand a trial.

## V

With respect to the FDIC's assertion that the FICB is a holder in due course of the mortgage note, one issue can be resolved on this motion. The Trustee argues that the mortgage note is not a negotiable instrument, Memorandum of Law in Opposition to Motion for Summary Judgment p. 5, because, *inter alia*, it is payable to Arnold I. Biegen and not to order or bearer. An inspection of the mortgage note, however, reveals the contrary. It states, *inter alia*

For Value Received,
Perri Kanterman
201 East 66th Street
New York, N.Y. 10021
Promises to pay to
Arnold I. Biegen
c/o Booth, Lipton & Lipton
405 Park Avenue
New York, N.Y. 10002

*Or order*, at ... the principal sum of two hundred sixty-five thousand (265,000.00) Dollars on Demand, together with interest computed from the date hereof at the rate of two (2%) percent plus the then Chase Manhattan Bank, N.A. prime rate.

Exhibit 2 to Cohen Affidavit (emphasis added). The note clearly satisfies the requirements of N.Y.U.C.C. § 3–104(1)(d) in that it is payable to Biegen or "order." [11]

Although that issue is easily resolved, examination of the record in this motion reveals significant open questions concerning when, if ever, FICB became a holder of the mortgage note and thus eligible for holder in due course status.

A holder in due course is a holder who takes the instrument

(a) for value; and

(b) in good faith; and

(c) without notice that it is overdue or has been dishonored or of any defense against or claim to it on the part of any person.

N.Y.U.C.C. § 3–302(1) (McKinney 1988).

From the record before us, it is clear that the FDIC has not satisfied its initial burden of showing that undisputed facts establish essential elements of a claim of holder in due course status. *See Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553. In this proceeding, it has not been shown that FICB or the FDIC as its receiver, became a holder of the mortgage note prior to May 17, 1988, some two months after the instant adversary proceeding was commenced. Nor is it

---

11. In its moving papers, the FDIC also claimed that FICB was a holder in due course of the mortgage. FDIC Memorandum of Law in Support of Summary Judgment 4–5. Its reply papers dropped that assertion, contending only that the mortgage note is a negotiable instrument. FDIC Reply Memorandum of Law in Support of Summary Judgment 1–3. In any event, the mortgage does not satisfy N.Y.U.C.C. § 3–104 and is, therefore, not a negotiable instrument.

shown that the mortgage note was endorsed.

Under the N.Y.U.C.C. a holder is defined as

a person who is in *possession* of a document of title or an instrument or an investment certificated security drawn, issued or *indorsed* to him or to his order or to bearer or in blank.

N.Y.U.C.C. § 1–201(20) (emphasis added).

On this record, it is not clear that the mortgage note was endorsed by the payee Biegen. The copy presented here, see Cohen Affidavit Exhibit 2, is not endorsed. Moreover, it is hardly clear that FICB or the FDIC was in possession of the mortgage note prior to May 17, 1988. The FDIC does not claim that Biegen held the note on FICB's behalf or that such constructive possession by FICB could enable FICB to be a holder under N.Y.U.C.C. § 1–201(20). Close examination of the Biegen affidavit of January 12, 1989, indicates that the original mortgage note was never turned over to FICB or the FDIC prior to May 17, 1988, the date on which Biegen's counsel turned over to the FDIC the original mortgage note, mortgage and the assignment of those documents. According to Biegen, after he executed an assignment of the mortgage and mortgage note, the bank reviewed those documents and requested that the mortgage and assignment be recorded. In a letter from Biegen to Hurtig of FICB dated Nov. 4, 1986, Biegen told Hurtig that he was enclosing a promisory note in the amount of $265,000 and that the letter served as an acknowledgement of Biegen's "undertaking to record the Mortgage, Mortgage Note and Assignment of Mortgage from Perri Kanterman to [him]"; and, of course, the "Assignment to [FICB]." Letter of Arnold I. Biegen to James Hurtig dated Nov. 4, 1986. Since the letter refers to a promissory note for $265,000, since a promissory note was in fact executed by Biegen in favor of FICB in that amount, Exhibit 1 to Cohen Affidavit, and since the letter makes a separate reference, to a "Mortgage Note" from Perri Kanterman, it appears that the note referred to in Biegen's letter

was not the mortgage note. Surely, Biegen, an experienced attorney would not use two different terms—"promissory note" and "Mortgage Note" in the same paragraph to describe the same thing. Thus, it does not appear that the Kanterman mortgage note itself was enclosed in the Nov. 4, 1986 letter to FICB.

Indeed, it appears from this record that the mortgage note was never delivered to FICB. Biegen claims that his law firm held the original documents for FICB. Yet, examination of that assertion reveals that it pertains only to the mortgage and assignment. He stated:

As I recall, the original documents were returned by the Clerk of Suffolk County to my law firm after they were recorded in accordance with the instructions on the backs of the documents ... [T]he bank had requested that my law firm maintain custody of the documents and I had agreed.

Biegen Affidavit of Jan. 12, 1988, ¶ 5.

Since originals of only the mortgage and assignment were delivered to the Clerk's Office for recording, Susan Schutz Affidavit ¶ 9 and Lorraine Schutz Affidavit ¶¶ 2–6, only those originals, *i.e.*, the mortgage and the assignment, could have been returned to Biegen for his law firm to hold. It appears, therefore, that Biegen had maintained possession of the original mortgage note and never delivered the original mortgage note to FICB. Supporting this conclusion is the affirmation by counsel for FICB. She stated that FICB, in February 1987, had a Kanterman note in the amount of $350,000 rather than $265,000. Affirmation of Suzanne Antippas ¶ 8. This indicates that FICB did not then have in its possession the original mortgage note. The failure of the FDIC to find the mortgage note at FICB further indicates that FICB did not have possession until May 17, 1988 when the FDIC obtained the mortgage and mortgage note from Biegen's counsel.

By that date, it was too late for FICB or the FDIC to be a holder in due course under N.Y.U.C.C. § 3–302(1). The complaint in this adversary proceeding was

filed on March 2, 1988. That complaint, brought by creditors apparently under N.Y. Debtor and Creditor Law § 278, alleged, *inter alia* that the Debtor's execution of the mortgage note and mortgage was a fraudulent conveyance by the Debtor. It can hardly be disputed that the FDIC, as receiver for FICB, and a named defendant in this adversary proceeding thus, had, from that complaint, "notice of any defense against Kanterman note and mortgage U.C.C. § 3–302(1), precluding it from being a holder in due course." *See Scarsdale Nat. Bank & Trust Co. v. Toronto–Dominion Bank,* 533 F.Supp. 378, 386 (S.D.N. Y.1982); *accord, Chemical Bank of Rochester v. Haskell,* 51 N.Y.2d 85, 92–93, 432 N.Y.S.2d 478, 480–481, 411 N.E.2d 1339, 1341–1342 (1980).

From all of this, it cannot be gainsaid that there is a triable issue of material fact whether FICB had in the mortgage note its possession prior to having notice of a claim that was given in fraud of creditors.[12]

For the foregoing reasons, FDIC's motion for summary judgment must be denied. Counsel for the Trustee is to submit an order consistent with this decision.

IT IS SO ORDERED.

---

**12.** Thus, we do not have to reach on this motion whether a mortgage note is a negotiable instrument under New York law. *Compare First National City Bank v. Valentine,* 62 Misc.2d 719, 720, 309 N.Y.S.2d 563, 564 (N.Y.Sup.Ct. Nassau County 1970) (reference in note to a collateral mortgage did not constitute a qualification of the unconditional promise to pay sufficient to destroy note's negotiability); *with Felin Assoc. v. Rogers,* 38 A.D.2d 6, 326 N.Y.S.2d 413 (1st Dept.1971) (note given in connection with mortgage is not negotiable instrument); *see also, Capital Investors Co. v. Executors of Estate of Morrison,* 484 F.2d 1157, 1160 (4th Cir.1973), *cert. den.,* 440 U.S. 981, 99 S.Ct. 1790, 60 L.Ed.2d 241 (1979) (fact that note was secured by real estate mortgage did not affect its negotiability); *Best Fertilizers of Arizona, Inc. v. Burns,* 117 Ariz. 178, 179, 571 P.2d 675, 676 (1977) (note does not cease to be negotiable when secured by mortgage); *First National Bank of Cape Cod v. North Adams Hoosac Savings Bank,* 7 Mass.App.Ct. 790, 796, 391 N.E.2d 689 (1979) (U.C.C. continues to recognize negotiability of note secured by real estate mortgage).