**In re Larry Joe LINDLEY, Debtor,**

**Carol Ann LINDLEY and Fred W. Woodson, Plaintiffs,**

**v.**

**Larry Joe LINDLEY, et al., Defendants.**

**Bankruptcy No. 89–00794–C. Adv. No. 89–0134–C.**

United States Bankruptcy Court, N.D. Oklahoma.

Oct. 23, 1990.

Clifford A. Jones, Oklahoma City, Okl., for plaintiffs.

A. Carl Robinson and Betty Outhier Williams, Muskogee, Okl., for defendants.

## MEMORANDUM OPINION

STEPHEN J. COVEY, Bankruptcy Judge.

This matter comes on to be heard upon the Second Amended Complaint of Carol Ann Lindley, a Creditor and ex-wife of the Debtor and Fred W. Woodson, Trustee, asking that certain transfers of the Debtor be found to be fraudulent, that the debt of Carol Ann Lindley be held to be nondischargeable and that the Debtor be denied a discharge of his debts. The Defendants have denied the allegations of the Complaint. This Court has heard eight days of testimony and has admitted and examined over 150 exhibits. Both Plaintiffs and Defendants have submitted extensive briefs on the factual and legal issues presented and the Court now makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

In order to understand the events that took place, the main participants and parties and their relationships to each other must be identified.

Larry Joe Lindley ("Debtor"),

Carol Ann Lindley (Ex-wife and Creditor of Debtor) ("Carol"),

Fred W. Woodson ("Trustee"),

Jack Randall Lindley (Brother of Debtor) ("Randy"),

Deborah Ann Lindley (Spouse of Randy) ("Deborah"),

Sharla Lindley (Present spouse of Debtor) ("Sharla"),

Jack Lindley (Father of Debtor and Randy) ("Jack"),

Mary Ruth Lindley (Mother of Debtor and Randy and wife of Jack) ("Mary Ruth").

The Debtor and Carol were married on March 21, 1970, and divorced on January 9, 1986, in Pottawatomie County, State of Oklahoma. At the time of the divorce, the Debtor had both substantial assets and liabilities. Included among his assets was stock in three different corporations which owned and operated three Holiday Inns in the State of Oklahoma as follows:

| | | |
|---|---|---|
| Shaw–Meek, Inc. | Holiday Inn of Shawnee | 36 shares or 15 percent |
| Lin–Feld, Inc. | Holiday Inn of Muskogee | 50 shares or 10 percent |
| Okla–Inn, Inc. | Holiday Inn of Henryetta | 300 shares or 15 percent |

In 1986 the other owners of the stock in the three corporations were as follows: Shaw–Meek—Jack, 40 percent and non-family owners Milfeld and Burns 45 percent; Lin–Feld—Randy, 15 percent; Mary Ruth, 25 percent and Milfeld, 50 percent. Okla–Inn—Randy, 10 percent, Mary Ruth, 25 percent, Milfeld, 50 percent.

In the Divorce Decree Carol was granted a one-half equitable interest in the Debtor's stock ownership in the three corporations

with the Debtor continuing to hold the legal title in the stock. The Decree granted Carol a lien against the stock and provided that when the stock was sold the proceeds were to be divided or applied on their joint debts. Also in the Decree Debtor was ordered to pay child support of $600.00 per month and alimony of $3,000.00 per month (this ceased when Carol remarried in February of 1987). Debtor also agreed to pay all debts of the marriage including a mortgage in excess of $400,000.00 on their home. On the sale of the house, Carol was to get one-half of the equity and the Debtor was either to buy her a $300,000.00 house or pay her $3,000.00 a month for 25 years as a property settlement. All of the participants and parties listed above were aware of the provisions of this Decree (except the Trustee).

After the divorce, the Debtor transferred all of his stock in the three Holiday Inns to either Jack or Randy. One of the crucial, factual determinations that has to be made in this case is when the transfers occurred. This issue of fact was hotly contested and much of the testimony and many of the documents, were directed towards it. This Court, without discussing all the various theories and contentions, finds that the transfers occurred as follows.

January 1, 1987, Debtor to Jack, 36 shares or 15 percent of Shaw–Meek. This finding is supported by the amended corporate tax returns. Debtor's personal 1987 tax returns and the endorsements on the stock certificates themselves.

January 1, 1987, Debtor to Jack, 50 shares or 10 percent of Lin–Feld. This is confirmed by the corporate tax returns, the Debtor's personal tax returns and the stock record book.

April 22, 1987, Debtor to Randy, 200 shares or 10 percent of Okla–Inn. This is confirmed by the endorsement on the stock certificate and the corporate record book.

May 2, 1988, Debtor to Randy, 100 shares or 5 percent of Okla–Inn. This was confirmed by the oral testimony of the witnesses and was not contested.

In addition to the transfers made by the Debtor to Jack and Randy, on May 2, 1988, Jack transferred all of the stock he owned in Lin–Feld, including the 10 percent received from the Debtor, to Randy and Deborah.

After the May 2, 1988 transfers, Randy and Deborah owned the Debtor's 10 percent interest in Lin–Feld and Randy alone owned the Debtor's 15 percent interest in Okla–Inn. The Lin–Feld stock had gone from Debtor to Jack and from Jack to Randy and Deborah and the Okla–Inn stock had gone directly from Debtor to Randy. The Debtor's 15 percent interest in Shaw–Meek was transferred to Jack and remained with Jack.

At the time of all the transfers, the Court finds that the value of the Debtor's stock was as follows:

Shaw–Meek—Valueless

Lin–Feld—$118,800.00

Okla–Inn—$ 88,200.00

The stock in Shaw–Meek was found to be valueless because the motel had historically lost money, other stockholders were not interested in buying out Debtor's interest, and a sale of the hotel in May of 1989 to a third party was based merely on an assumption of the mortgage with no money being paid to the shareholders.

The value of Lin–Feld was arrived at from considering the hotel's net operating income and a sale by Randy of his 50 percent interest in February 1990 to co-stockholder, Milfeld.

The value of Okla–Inn was determined by considering the net operating income plus a sale of the property to a third party, Wadco, on June 30, 1987.

Jack, as to the Lin–Feld and Shaw–Meek stock, is the initial transferee. Randy, as to the 15 percent transferred in Okla–Inn, is an initial transferee. Randy and Deborah as transferees of the Lin–Feld stock from Jack, are designated as immediate transferees.

None of the transferees paid any consideration for the transfers. The Lindleys offered much testimony attempting to prove that a valuable consideration had been paid. For example, Randy contends

he paid $25,000.00 in 1985 to the Debtor for the transfer of the 200 shares or 10 percent of Okla–Inn. This Court rejected this testimony because even though Randy did pay the Debtor $25,000.00 in 1985, there is no evidence other than the testimony of Randy that this was in payment of the stock. As found above, the stock itself was transferred on January 1, 1987, and this Court does not believe that a payment of $25,000.00, some 15 months earlier, was in exchange for this stock.

Jack contends that on April 24, 1986 he paid the Debtor and Carol $40,000.00 by check for all of their stock in the three corporations. This contention is not supported by any evidence other than the testimony of Jack and the Debtor. Carol testified that the $40,000.00 was a gift from Jack to help them pay their debts and that she did not intend or know that she was selling her stock. After the check had been delivered to the Debtor, and out of the presence of Carol, the Debtor wrote on the check that it was for the sale of Lin–Feld, Okla–Inn and Shaw–Meek. This tampering with the check is very suspicious and makes the contentions of Jack and Debtor as to the sale of the stock in 1986 unbelievable.

In regard to the May 2, 1988, transfer from Jack to Randy and Deborah of the Lin–Feld stock, the Court finds that they did not receive the stock in good faith or for value. The Lindleys are a close knit family and Randy and Deborah knew or should have known that the transfers were made to defeat the rights of Carol and the Debtor's creditors.

Randy and Deborah contend they paid Jack fair value for the Lin–Feld stock. This Court finds, however, that the consideration paid by them was valueless in that it consisted mainly of worthless accounts receivable and a forgiveness of debts owed by them to Jack which debts never, in fact, existed. Randy and Deborah paid

$8,000.00 to Jack several months after the transfers but there is no evidence that this was in payment of the Lin–Feld stock other than Randy's testimony which the Court finds to be not credible.

At the time of all the transfers, the Debtor was indebted to Carol in an undetermined amount for his obligations under the Divorce Decree and to four banks as follows:

1. First National Bank of Henryetta—unsecured $66,000.00;

2. Federal National Bank—unsecured—$78,000.00;

3. First State Bank of Seminole—unsecured—$80,000.00;

4. Security Savings & Loan of Texarkana secured on home—$500,000.00.

The only valuable asset that the Debtor had, other than the stock, at the time of these transfers was his home which was worth no more than the mortgage against it. The Debtor, therefore, was rendered insolvent by the transfers made on January 1, 1987 in that after the transfers his liabilities exceeded the fair value of his assets.[1]

The Court also finds that the transfers were made with an actual intent to hinder, delay and defraud Carol of her one-half interest in the stock and the Debtor's creditors. The Court infers this actual intent to defraud from the following "badges of fraud".

1. The Debtor was rendered insolvent;

2. No consideration was paid;

3. The transfers violated terms of the Divorce Decree and were kept secret from Carol and the banks.

4. Debtor still received dividends on the stock after the transfers which indicates he was to receive the stock back when the "financial smoke" had cleared.

5. The transfers were made to close family members.

1. Section 101(31) of the Bankruptcy Code defines insolvent as follows:
   "insolvent" means—
   (A) with reference to an entity other than a partnership, financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation, exclusive of—
   (i) property transferred, concealed, or removed with intent to hinder, delay, or defraud such entity's creditors; and ...

The other major event in this litigation has to do with the ownership of the City Lights Club ("Club") which was the tavern located in the Shaw–Meek Holiday Inn. This saga begins on April 30, 1988, when the Debtor married Sharla R. Dickinson, who was a former employee of the Club and at the time a part-time school teacher. After the marriage, Sharla kept her maiden name on her driver's license, credit cards, and an account at the American National Bank of Shawnee. In mid August, Sharla got a full time teaching job in Broken Arrow and moved to Tulsa. The Debtor still spent the weekdays in Shawnee working in the family business, or as he put it, being unemployed.

Between August 1988 through February 1989, the Debtor, in fact, owned and operated the Club. A man by the name of Lawrence Pinto had purchased the motel from the Lindleys, but was unable to operate the Club. The Debtor took over the Club, but pretended Sharla was the owner and operator at a time when she was living and working in the Tulsa area. The evidence shows that substantially all the money received from the operation of the Club went first to Sharla Dickinson's account and then was transferred to the Debtor or went directly to pay his debts. Checks were made payable to Sharla Dickinson rather than Sharla Lindley and then the money was transferred to the Debtor. Many of the checks were written by the Debtor to Sharla and then endorsed by the Debtor in Sharla's name. Sharla never wrote any checks. Never purchased any inventory. Never looked at the books and records. In all, Larry received approximately $28,000.00 from the Club during the five or six month period, after it had been laundered through the Sharla Dickinson account. During this period the Debtor was heavily in debt and was receiving unemployment compensation from the State of Oklahoma. The purpose of pretending that Sharla was the owner/operator of the Club was to hide these funds from his creditors and the State of Oklahoma.

Other important evidence in regard to the Club is that Jack told an outside accountant that it was Debtor's business and the Debtor himself told banker Clyde Estes that it was his business.

On April 19, 1989, the Debtor filed a petition for relief under Chapter 7 of the Bankruptcy Code. On his Statement of Financial Affairs, the Debtor knowingly and fraudulently make false oaths as follows:

1. Stated his income in 1988 was $11,-700.00. This was false because it did not disclose the income received from the Club.

2. Did not disclose that he had been in business as owner/operator of the Club.

3. Did not disclose the transfer of stock in Okla–Inn to Randy on May 2, 1988.

## CONCLUSIONS OF LAW

The Court must decide the following issues.

1. Were the transfers made by the Debtor more than a year prior to bankruptcy fraudulent and therefore voidable under § 544(b) of the Bankruptcy Code and 24 O.S. §§ 116A(1), 116B and 117A? These transfers were as follows:

   a. January 1, 1987, Debtor to Jack, 36 shares or 15 percent of Shaw–Meek.
   b. January 1, 1987, Debtor to Jack, 50 shares or 10 percent of Lin–Feld.
   c. April 22, 1987, Debtor to Randy, 200 shares or 10 percent of Okla–Inn.

2. Did the transfer by Jack to Randy and Deborah on May 2, 1988, of 50 shares or 10 percent of Lin–Feld, that Jack had received from the Debtor, render Randy and Deborah liable to the Trustee under § 550 of the Bankruptcy Code as immediate transferees?

3. Was the transfer within one year of bankruptcy by the Debtor to Randy of 100 shares or 5 percent of Okla–Inn fraudulent and therefore avoidable under § 548 of the Bankruptcy Code?

4. Should the Debtor be denied a discharge pursuant to §§ 727(a)(2)(A) and (4)(A) of the Bankruptcy Code for the following reasons?

   a. A concealment within one year of bankruptcy of his ownership of the

Club with intent to hinder, delay or defraud a creditor.

b. A transfer of 100 shares or 5 percent of stock in Okla–Inn on May 2, 1988, within one year of bankruptcy, with intent to hinder, delay or defraud a creditor.

c. Making of a false oath in his Statement of Affairs.

5. Whether Carol has a non-dischargeable debt against the Debtor, pursuant to §§ 523(a)(4) and (6) of the Bankruptcy Code, because the Debtor either breached a fiduciary obligation to Carol in regard to the stock or willfully and maliciously injured the property of Carol.

## WERE THE TRANSFERS FRAUDULENT?

The Debtor transferred stock more than a year prior to bankruptcy to Jack on January 1, 1987, and to Randy on April 22, 1987. The Trustee argues that these transfers are fraudulent and voidable under § 544(b) and 24 O.S. §§ 116A(1), 116B and 117A. The material portions of these statutes are as follows:

544(b):

The trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.

24 O.S. § 116A:

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or

...

24 O.S. § 116B:

In determining actual intent pursuant to the provisions of paragraph 1 of subsection A of this section, consideration may be given, among other factors, to whether: ...

1. the transfer or obligation was to an insider;

2. the debtor retained possession or control of the property transferred after the transfer;

3. the transfer or obligation was disclosed or concealed;

4. before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

5. the transfer was of substantially all of the debtor's assets;

6. the debtor absconded;

7. the debtor removed or concealed assets;

8. the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

9. the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

10. the transfer occurred shortly before or shortly after a substantial debt was incurred; and

11. the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

24 O.S. § 117A:

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

■ Under these provisions, the Trustee can avoid a transfer even if it occurred prior to bankruptcy if the following conditions exist:

1. There were creditors in existence at the time of the transfers who could have avoided them;

2. The Debtor was insolvent and no consideration was paid; or,

3. The transfers were made with an actual intent to hinder, delay or defraud a creditor.

■ The Court finds that in regard to the January 1, 1987, transfer of Lin–Feld stock and the April 22, 1987, transfer of Okla–Inn stock all of the above conditions existed at the time of the transfers, therefore, the transfers are fraudulent and can be avoided by the Trustee. At the time of these transfers, there were creditors in existence who could have avoided them (Carol and the four banks), the Debtor was rendered insolvent and no consideration was paid. Additionally, the Court finds that the transfers were made with an actual intent to hinder, delay or defraud the Debtor's creditors. While there is no direct evidence of this actual intent to defraud, the Court infers this conclusion from all the facts and circumstances in the case and from the presence of the traditional "badges of fraud". These "badges of fraud" are described above and many cases hold that an actual intent to defraud can be inferred from their presence. See *United States v. Fernon*, 640 F.2d 609 (5th Cir.1981); *Wieboldt Stores, Inc. v. Schottenstein*, 94 B.R. 488 (Bkrtcy.N.D.Ill.1988); *In re Warner*, 87 B.R. 199 (Bkrtcy.M.D.Fla.1988). Also, under 24 O.S. § 116B substantially all the factors listed are present in this case.

■ As to the January 1, 1987, transfer of Shaw–Meek stock, the Court will hold that this was not fraudulent and cannot be avoided because the stock was valueless. Therefore, a fair consideration was paid, i.e. nothing, and the Court will not infer an actual intent to hinder, delay or defraud a creditor.

■ After receiving a fraudulent transfer of the Debtor's Lin–Feld stock on January 1, 1987, Jack further transferred the stock to Randy and Deborah on May 2, 1988. Under § 550 of the Bankruptcy Code, the Trustee can recover either the property transferred or the value of such property from Randy and Deborah provided they did not receive the stock in good faith, for value, and without knowledge of the voidability of the transfer to Jack from the Debtor.[2] The Court has found above that Randy and Deborah did not pay value to Jack for the transfers and that Randy and Deborah knew or should have known that the purpose of the transfers from the Debtor to Jack were to hinder, delay and defraud both Carol and the other creditors of the Debtor. The good faith issue is discussed in *In re Robbins*, 91 B.R. 879 (Bkrtcy.W.D.Mo.1988) where the court states as follows:

"The Code does not define 'good faith' but courts have long defined this term under prior law." 4 Collier on Bankruptcy P. 550.02, p. 550–9. (15th ed. 1987). "The question is solely whether the grantee knew or should have known that he was not trading normally but that, on the contrary, the purpose of the trade, so far as the debtor was concerned, was the defrauding of his creditors." 4 Colliers P. 550–02, p. 550–9, n. 3 (citations omitted). Although neither the Code, nor the legislative history interprets the standard to be used in determining whether a subsequent transferee took "without knowledge of the voidability of the transfer avoided", "[t]he Commission intended

---

2. Section 550 of the Bankruptcy Code is as follows:

(a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, ... 548, ... of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—

(1) the initial transferee of such transfer ... or

(2) any immediate or mediate transferee of such initial transferee.

(b) The trustee may not recover under section (a)(2) of this section from—

(1) a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided; or

(2) any immediate or mediate good faith transferee of such transferee.

(c) The trustee is entitled to only a single satisfaction under subsection (a) of this section.

the standard to mean 'if the transferee knew facts that would lead a reasonable person to believe that the property [transferred] was recoverable.'": 4 Collier on Bankruptcy P. 550.03 p. 550–10 (15th ed. 1987).

In the present case, Randy and Deborah knew about the provisions of the Divorce Decree granting Carol a one-half equitable interest in the stock, knew about Debtor's financial condition, and knew that Jack had not paid a valuable consideration to the Debtor for the Lin–Feld stock. This is sufficient to show that Randy and Debtor did not receive the stock in good faith and without knowledge of the avoidability of the transfers. See also *In re Kanterman,* 97 B.R. 768 (Bkrtcy.S.D.N.Y.1989).

■ The final transfer by the Debtor was on May 2, 1988, of his final 100 shares, or 5 percent, in Okla–Inn to Randy. The Trustee contends this transfer was fraudulent and avoidable under § 548 of the Bankruptcy Code. The material sections of this statute are as follows:

(a) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

(1) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or

(2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(B)(i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

For the same reasons as stated above in regard to the other transfers, this transfer is also fraudulent and can be avoided by the Trustee because it was made by the Debtor with the actual intent to hinder, delay or defraud a creditor and also because the Debtor was insolvent and no consideration was paid.[3]

■ Under § 550, cited above, the Court has the option of ordering a return of the property fraudulently conveyed or grant the Trustee a judgment for its value. In the present case, neither Jack nor Randy and Deborah own any of the stock, it having been transferred to third parties for value. The Court will, therefore, grant the Trustee judgments against the Defendants as follows.

1. Against Jack as initial transferee of the Lin–Feld stock for $118,800.00.

2. Against Randy as initial transferee of Okla–Inn stock in the amount of $88,200.00.

3. Against Randy and Deborah as immediate transferees of the Lin–Feld stock in the amount of $118,800.00.[4]

### DISCHARGE OF DEBTOR

■ Both the Trustee and Carol object to the discharge of the Debtor under §§ 727(a)(2)(A) and (a)(4)(A). The material portions of said sections are as follows:

(a) The court shall grant the debtor a discharge, unless— ...

(2) the debtor, with intent to hinder, delay, or defraud a creditor ... has transferred ... or concealed— ...

(A) property of the debtor, within one year before the date of the filing of the petition; or ...

(4) the debtor knowingly and fraudulently, in or in connection with the case—

(A) made a false oath or account;

The Court will deny the Debtor a discharge because the Debtor, within one year

---

**3.** This transfer was also fraudulent and avoidable for the same reasons the prior transfers were avoidable under § 544(b) of the Bankruptcy Code and 24 O.S. §§ 116A, B and 117A.

**4.** Under § 550(c) of the Code, the Trustee is entitled to only a single satisfaction of these judgments.

of bankruptcy, transferred property with the intent to hinder, delay or defraud a creditor. As discussed above, on May 2, 1988, the Debtor fraudulently transferred 100 shares, or 5 percent, of his stock in Okla–Inn to Randy.

■ The Court further holds that the Debtor should be denied a discharge because, within one year of bankruptcy, with intent to hinder, delay or defraud a creditor, the Debtor concealed his ownership in the Club and the income derived therefrom. The only purpose of pretending that Sharla was the owner of the Club was to prevent his creditors and Carol from attaching his income for payment of their debts. Additionally, the income was hidden so that the Debtor could draw unemployment compensation from the State of Oklahoma. These actions of the Debtor, in concealing his ownership of the Club along with all the other facts and circumstances of this case, establish the required concealment with actual intent to hinder, delay or defraud.

■ The Court will also deny the Debtor a discharge because of the making of false oaths in regard to his Statement of Affairs that were filed in this case along with his Schedules of Assets and Liabilities. In response to questions which he had a duty to answer truthfully, he made the following false oaths:

1. He did not disclose his income from the Club.

2. Did not disclose that he had been an owner of the Club.

3. Did not disclose the transfer of Okla–Inn stock to Randy on May 2, 1988.

In the case of *In re Sofro*, 110 B.R. 989 (Bkrtcy.S.D.Fla.1990) the court stated as follows:

. Furthermore, the Court finds that the debtors made false oaths and accounts in their petition in violation of 11 U.S.C. § 727(a)(4)(A). A debtor has a paramount duty to consider all questions

posed on a statement or schedule carefully and see that the question is answered completely in all respects. *In re Burke*, 83 B.R. 716 (Bankr.D.N.D.1988); *In re Dias*, 95 B.R. 419 (Bankr.N.D.Tex.1988). In order to deny a discharge under § 727(a)(4)(A), the trustee or creditor must prove that the debtor "knowingly and fraudulently, in or in connection with the case ... made a false oath or account." The purpose of § 727(a)(4)(A) is to insure that adequate information is available to those interested in the administration of the bankruptcy estate without the need or examinations or investigations to determine whether the information is true. *In re Watkins*, 84 B.R. 246 (Bankr.S.D.Fla.1988). The debtors signed their petition and schedules under oath and the penalty of perjury that they had read the answers as required and that the same were true and correct to the best of their knowledge, information, and belief. However, the debtors intentionally failed to list numerous assets and transactions which they were intimately familiar with in their petition....

See also *In re Ingersoll*, 106 B.R. 287 (Bkrtcy.M.D.Fla.1989).

In the present case, the Debtor was intimately familiar with the omitted information. He was required in the Statement of Affairs to disclose this information, and instead, concealed it. This intentional and willful concealment of known information that the Debtor was required to give constitutes a false oath and is sufficient to deny the Debtor a discharge.[5]

### DISCHARGEABILITY OF CLAIM OF CAROL

Carol contends she has a claim against the Debtor because he fraudulently conveyed her one-half interest in the stock and that this claim is non-dischargeable under

---

5. The Debtor in signing his Statement of Affairs made the following oath: I, Larry Joe Lindley, certify under penalty of perjury that I have read the answers contained in the foregoing statement of financial affairs and that they are true

either §§ 523(a)(4) or (6) [6]. This claim, however, is moot because the Court has held the Debtor will not receive a discharge of any of his debts. Also, Carol will be entitled to one-half of the proceeds of the recovery by the Trustee of the judgments entered in this proceeding. This is because, pursuant to the Divorce Decree, she is a one-half equitable owner of the stock fraudulently conveyed by the Debtor. To grant her a judgment for the value of the same stock for which the Trustee is being granted a judgment, would be redundant. The Court, therefore, makes no ruling on the dischargeability of Carol's claims against the Debtor pursuant to §§ 523(a)(4) and (6). The Court will enter a separate judgment order pursuant to this Memorandum Opinion.

and correct to the best of my knowledge, information, and belief.

**6.** Claims for breach of fiduciary relationship or intentional injury to property are nondischargeable.