**In re WOODSTONE LIMITED PARTNERSHIP, d/b/a Woodstone Apartments, Debtor.**

**Bankruptcy No. 189–93578–352.**

United States Bankruptcy Court, E.D. New York.

Nov. 8, 1991.

**680**

Levine, Weinberg, Kaley & Pergament, P.C., Garden City, N.Y., for Woodstone Ltd. Partnership.

Philips, Nizer, Benjamin, Krim & Ballon, Garden City, N.Y., for First Gibralter Bank.

MARVIN A. HOLLAND, Bankruptcy Judge:

First Gibralter Bank (hereinafter "FGB") filed a proof of a secured claim in the amount of $5,153,151, exclusive of interest, costs, expenses and attorneys' fees, against the debtor in possession, Woodstone Limited Partnership (hereinafter "the debtor" or "Woodstone"). Woodstone moved to reduce or expunge the secured claim of FGB, or, in the alternative, to reduce or reclassify FGB's secured claim and to determine the validity and extent of FGB's lien in real property located in Fort Worth, Texas, and known as the Woodstone Apartments. FGB filed papers in opposition to Woodstone's motion. The parties submitted briefs prior to the hearing held on June 5, 1991 as well as post-hearing briefs.[1]

At the hearing, the parties advanced only oral arguments. No testimony was offered. At the conclusion of the hearing it was agreed that the court should decide this matter as if FGB had moved to dismiss Woodstone's motion for failure to state a claim upon which relief can be granted under Fed.R.Civ.P. 12(b)(6) as made applicable by Bankruptcy Rule 7012(b), now Fed.R.Bankr.P. 7012(b).

We deny FGB's motion and hold that Woodstone has adequately set forth a claim sufficient to entitle it to an evidentiary hearing regarding the enforceability of the alleged modification to the loan agreement under Texas law.

These proceedings are subject to bankruptcy court jurisdiction under 28 U.S.C. § 1334(b), 28 U.S.C. § 157(a) and the Order of Referral of Matters to Bankruptcy Judges of this district, 69 B.R. at 186. They are core proceedings under 28 U.S.C. § 157(b)(2)(B) and (K).

*Statement of Facts*

The following is the parties' position with regard to the facts pertinent to the discussion herein. Woodstone's version of those facts in dispute is assumed for purposes of this discussion.

1. On August 14, 1987 Woodstone and First Texas Savings Association (hereinafter "First Texas") entered into a loan agreement under which Woodstone borrowed $4,945,000 from First Texas and gave First Texas a note with a term of 15 years secured by a mortgage on the property (both the loan agreement and the note referred to hereinafter as "the loan agreement"). FGB maintains that this mortgage was properly perfected (see FGB objection dated April 19, 1991) and Woodstone does not dispute this.

2. The parties do not dispute the payments schedule due to First Texas under the loan agreement. The parties agree that the loan agreement provides that payments for the first year were to be equal to the cash flow available to Woodstone, pre-

1. Although denominated a motion directed towards FGB's claims or liens, the debtor is actually seeking a declaration of the validity and enforceability of a modification agreement, the effect of which would be to increase the value of the debtor's sole asset.

sumably from the Woodstone Apartments. No dispute is before us with respect to the payments that were due for the first year.

3. For the rest of the term of the loan the rate of interest payment due from Woodstone to First Texas varied. It ranged from 5% for the second and third year to the prime rate plus 1% for years eleven to fifteen. Payments of amortization were due to First Texas commencing as of the sixth year.

4. Additional payments of $127,500 each were due to First Texas by August 1988 and August 1989. FGB argues that the agreement required Woodstone to provide letters of credit for these said amounts. It is not disputed that FGB was paid $127,500 for the payment due on August 1988, while it was paid only $93,031 for the payment that was due in August 1989. It is not clear from the parties' papers whether the $127,500 due to FGB in August 1989 (the second such payment) was due in addition to the interest payments required under the loan agreement or not. However, the parties did not pursue this issue, and we need not address it here.

5. In August 1988 Woodstone approached First Texas with a request to modify the loan agreement. As a result of several months of negotiations the parties reached an accord, the effect of which is central to this decision. Woodstone argues that there was a binding modification or novation of the loan agreement, while FGB maintains that the discussions had no binding effect. In our discussion of the effect of these negotiations we will refer to the "understanding" reached between the parties.

6. It is not disputed that there was an "understanding" that interest was to continue to accrue at the 5% contract rate although it was to be paid during the second year of the loan at the reduced rate of 2.5 percent.

7. During the negotiation process, First Texas submitted several documents to Woodstone which contained specific and explicit language to the effect that they were proposals only and that First Texas was not to be bound by any agreement unless it had executed the appropriate papers and had received the required approvals from its supervising regulatory agency. The papers clearly stated that no modification should be implied if these conditions were not met.

8. On October 28, 1988 the Federal Home Loan Bank of Dallas (hereinafter "FHB Dallas") notified First Texas by letter that the application to modify the Woodstone loan agreement, i.e., to reduce the interest payment rate from 5 percent to 2.5 percent for the period from August 14, 1988 through August 14, 1989, was approved. Although the parties do not dispute the existence or the accuracy of such a letter, FGB refuses to acknowledge the letter as an approval by the federal regulators of the "understanding".

9. On November 14, 1988 counsel for First Texas sent a letter to Ms. Sandra Robin, First Texas' vice-president, informing Ms. Robin that the Federal Home Loan Bank had approved the request to modify the repayment provisions of the Woodstone loan. In his letter counsel instructed Ms. Robin that "a memo stating the purpose for the modification be prepared and included at the front of the file *so an examiner can easily locate the approval.*" (emphasis added). FGB did not contest the existence or the accuracy of this letter. It is unclear whether First Texas complied with this requirement. Although the letter itself does not specifically state that it refers to the loan agreement subject to the dispute brought before this court, this is not disputed by FGB.

10. On December 21, 1988 First Texas, by its counsel, forwarded to Woodstone's counsel for Woodstone's execution documents to memoralize the modification. These documents also contained the provisions stated in paragraph 7 *supra*. Woodstone executed the documents and obtained the letter of credit which was required to be submitted to First Texas together with the executed documents, but never forwarded them to FGB. Woodstone's counsel stated that the only reason for the failure to tender these papers to First Tex-

as was due to a telephone call received from First Texas' counsel advising Woodstone's counsel not to deliver same. These statements are disputed by FGB.

11. On December 28, 1988 the Federal Home Loan Bank Board (hereinafter "FHB Board") appointed the now defunct Federal Savings and Loan Insurance Corporation (hereinafter "FSLIC") as receiver of First Texas. On the same day FSLIC sold most of First Texas' assets, including the Woodstone loan, to FGB. The transaction took the form commonly referred to as a "purchase and assumption agreement." Transcript of February 27, 1991 at 20.

12. FGB, refusing to acknowledge the enforceability of the "understanding" outlined *supra,* filed a proof of claim for the entire amount outstanding under the original loan agreement.

13. Woodstone argues that the loan agreement between it and First Texas is a "covered asset" under the "Assistance Agreement" entered between FGB and FSLIC, under which FSLIC guaranteed FGB against any loss that FGB might incur with regard to the Woodstone loan. Neither side has raised the "real party in interest" issue.

*Parties' Positions*

Woodstone seeks three types of relief:

■ (i) To expunge FGB's secured claim pursuant to 11 U.S.C. § 502(b)(1) and (2). We read the relief requested by Woodstone under these sections to mean that the secured claim should be expunged in total. Woodstone, however, is not entitled to the relief requested. It cannot expunge FGB's total claim pursuant to 11 U.S.C. § 502(b)(1) since Woodstone objected only to that portion of FGB's claim which may be unenforceable against it under the modification agreement, i.e., the difference be-

tween the claim as computed by FGB based on the original terms of the loan agreement and as computed by Woodstone based on the loan agreement as modified by the "understanding".[2] In addition, Woodstone cannot be awarded the relief requested under 11 U.S.C. § 502(b)(2) because no proof was submitted regarding the amount of unmatured interest claimed by FGB.

■ We note further that Woodstone is not entitled to a determination directly affecting FGB's lien since it did not follow Bankruptcy Rule 7001(2), Fed.R.Bankr.P. 7001(2), which mandates the filing of an adversary proceeding rather than notice of motion.

(ii) To reduce or reclassify the secured claim of FGB; and

(iii) To determine the "validity and extent" of FGB's lien in the Woodstone Apartments. Woodstone does not contest the creation or the perfection of FGB's rights in the Woodstone Apartments. See: Debtor's proposed disclosure statement, pp. 4, 13 (docket no. 28), debtor's proposed plan of reorganization, Article V (docket no. 27). The relief sought by Woodstone is that FGB's secured claim should be reduced to an amount that would represent the "understanding" reached between Woodstone and the original holder of the note—First Texas. This is therefore the only issue addressed herein. The reliefs requested under 11 U.S.C. § 502(b)(1) and (2), and the objections based on the validity of the lien held by FGB, are therefore denied.

FGB's position is clear and straightforward. FGB argues that it must prevail under three principles of federal law and one principal of Texas law:

(a) That the modification agreement is not binding and enforceable under the D'Oench Duhme doctrine. *D'Oench*

---

**2.** The economic and financial effect, if any, of the modification agreement on the value and the classification of FGB's claim is a separate issue which the parties apparently preferred to defer pending the disposition of FGB's estoppel doctrines. The disposition of this issue is crucial. Clearly, the "understanding" even if enforceable, would not reduce the amount of FGB's total claim; it may, however, affect the value of the collateral and the extent to which, if any, there is a bifurcation of FGB's total claim to a secured portion and an unsecured portion. Also, to the extent to which payment under the agreement as modified was able to to reduce cash outflow to an amount equal to or less than cash inflow, the economic viability of the debtor would be enhanced.

*Duhme & Co. v. FDIC,* 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), *reh. denied* 315 U.S. 830, 62 S.Ct. 910, 86 L.Ed. 1224 (1942) (hereinafter "D'Oench Duhme").

(b) That the modification agreement is not binding and enforceable under section 1823(e) of the Federal Deposit Insurance Act, 12 U.S.C. § 1823(e).

(c) That FGB is protected by the federal holder in due course doctrine and thus not bound by the modified terms.

(d) That under Texas law there was no enforceable modification agreement.

## DISCUSSION

### I.  *The D'Oench Duhme Doctrine*

▪ FGB argues, in essence, that under the doctrine enunciated by the Supreme Court in D'Oench Duhme, the alleged "understanding" between Woodstone and First Texas is not enforceable against it as a purchaser of the note from the FSLIC while acting as First Texas' receiver. D'Oench Duhme dealt with notes given to enhance a bank's apparent financial condition under a secret agreement that the notes would not be called for payment. The maker raised the agreement as a defense in an action to collect on the notes brought by the Federal Deposit Insurance Corporation (hereinafter "FDIC") as successor to the bank. The Supreme Court ruled in favor of the FDIC stating that "as a matter of federal law based on the policy of the National Banking Act to prevent the impairment of a bank's capital resources by prohibiting such acquisition, that the defendant could not rely on *his own wrongful act* to defeat the obligation of the note as against the receiver of the bank." *D'Oench Duhme* at 458, 62 S.Ct. at 679 (emphasis added). "[A]n accommodation maker is not allowed that defense as against the receiver of the bank and its creditors ... *where his act contravenes a general policy to protect the institution* of banking from such secret agreements." *Id.* (emphasis added). The Court established a test for the inability to raise the secret agreement as a defense:

The test is whether the note was designed to deceive the creditors or the public authority or would tend to have that effect. It would be sufficient ... that the maker *lent himself to a scheme or arrangement whereby the banking authority on which respondent relied in insuring the bank was or was likely to be misled.*

*Id.* at 460, 62 S.Ct. at 681 (emphasis added).

Even though the rule of law was narrowly expressed in D'Oench Duhme, its progeny have so expanded upon the doctrine that recent opinions have stated that "[t]he D'Oench Duhme doctrine has evolved to a rule that today is expansive and perhaps startling in its severity; *Bowen v. FDIC,* 915 F.2d 1013, 1015 (5th Cir.1990)." *FDIC v. Sather,* 468 N.W.2d 347 (Minn.App.1991). See *Beighley v. FDIC,* 868 F.2d 776 (5th Cir.1989), *reh. denied,* 1989 WL 20859, 1989 U.S.App.Lexis 6404 (5th Cir.1989) applying the D'Oench Duhme doctrine to the FDIC in its corporate capacity as well as in its receiver capacity; *FSLIC v. Two Rivers Associates, Inc.,* 880 F.2d 1267 (11th Cir. 1989) applying D'Oench Duhme to FSLIC in its capacity as receiver; *FSLIC v. Master S.,* 1988 WL 127575, 1988 U.S.Dist.Lexis 13270 (E.D.N.Y.1988) applying D'Oench Duhme to the FSLIC in its corporate capacity relying on *FSLIC v. Murray,* 853 F.2d 1251 (5th Cir.1988); *Krauss v. FDIC,* 769 F.Supp. 519 (S.D.N.Y.1991) and cases cited therein, knowledge of the FDIC of the bank's oral misrepresentation before it acquired the notes is irrelevant; *Taylor Trust v. Security Trust,* 844 F.2d 337 (6th Cir.1988) FSLIC knowledge does not make D'Oench Duhme inapplicable; *Carteret Sav. Bank v. Compton, Luther & Sons,* 899 F.2d 340 (4th Cir.1990), defendant's intent to mislead the savings and loan association is irrelevant; *Bell & Murphy v. Interfirst Bank,* 894 F.2d 750 (5th Cir. 1990), *cert. denied* — U.S. —, 111 S.Ct. 244, 112 L.Ed.2d 203 (1990) and *Porras v. Petroplex Sav. Assn.,* 903 F.2d 379 (5th Cir.1990) extending the D'Oench Duhme doctrine to bar recovery against the FDIC's bank transferee; *FDIC v. MM & S Partners,* 626 F.Supp. 681 (N.D.Ill.1985) D'Oench Duhme extends beyond contract

situations and covers the failing bank's misrepresentations; *FSLIC v. HSI*, 657 F.Supp. 1333 (E.D.La.1986) D'Oench Duhme extends to fraud in the inducement defense; *Porras v. Petroplex Sav. Assn.*, 903 F.2d 379 (5th Cir.1990) applying D'Oench Duhme to bar a usury defense.

However, even the most expanded version of the doctrine is not sufficiently broad to encompass Woodstone because Woodstone has not "lent [itself] to a scheme or arrangement whereby the banking authority ... was or was likely to be misled." *D'Oench Duhme*, 315 U.S. at 460, 62 S.Ct. at 681. Since the facts herein do not meet the test established by the Supreme Court, the rule of estoppel established by D'Oench Duhme is not applicable.

Even under the overly broad version of the D'Oench Duhme doctrine, some culpability, active or passive, must be established. "Thus the D'Oench Duhme doctrine applies where the only *element of fault* on the part of the borrower was his or her failure to reduce the agreement to writing." *Timberland Design v. First Service Bank*, 932 F.2d 46 (1st Cir.1991) (emphasis added). "Though petitioner was not a participant in this particular transaction and, so far as appears, was ignorant of it, nevertheless it was responsible for the creation of the false status of the note in the hands of the bank." *D'Oench Duhme*, 315 U.S. at 461, 62 S.Ct. at 681. In *FDIC v. McClanahan*, 795 F.2d 512 (5th Cir.1986) the court, while ruling in the FDIC's favor, stated that the defendant's conduct could "only be characterized as reckless", *Id.* at 516, and further added:

> It may be possible to imagine circumstances in which—whether because of prevailing business practices or the maker's extreme lack of sophistication—the signing of a blank note could be so *wholly innocent* as to preclude the FDIC from requiring on that basis alone that the maker be estopped from defending himself on grounds of failure of consideration and fraud in the inducement.

*Id.* at 516 (emphasis added).

In *FDIC v. Aetna Casualty & Surety Company*, 947 F.2d 196 (6th Cir.1991) the court stated:

> "None of the secret or unwritten contractual conditions present in both the *D'Oench* and the *Langley* cases are present in the facts before us ... In the current case, *Aetna is not colluding with officers of the failed bank in an attempt to rewrite the term of the contract.*"

*Id.* 947 F.2d at 201 (emphasis added).

In *FDIC v. Meo*, 505 F.2d 790 (9th Cir. 1974) the court citing the "lent himself to a scheme" test and the concurring opinion of Justice Jackson in D'Oench Duhme stating that " 'where *ordinary and good faith transactions* are involved', the FDIC succeeds 'only to the rights which the bank itself acquired' ", *Id.* at 793 (emphasis added), held that since "Meo is *innocent of any wrongdoing or negligence* [t]he special facts present in D'Oench ... should not apply ... A bona fide borrower, like Meo, is not an insurer of financial representations of the bank with whom he conducts business." *Id.* at 793 (emphasis added). See also, *Gallant v. Kanterman*, 108 B.R. 432, 435 (S.D.N.Y.1989), 97 B.R. 768, 774–6 (Bankr.S.D.N.Y.1989); *FDIC v. MM & S Partners*, 626 F.Supp. 681 (N.D.Ill.1985) at 684; *FDIC v. Richman*, 80 F.R.D. 114, 117 (E.D.N.Y.1978), *aff'd* 666 F.2d 780 (2d Cir. 1981); *FSLIC v. Murray*, 853 F.2d 1251, 1255 (5th Cir.1988); *FSLIC v. Master S.*, 1988 WL 127575 at 3–4, 1988 U.S.Dist.Lexis 13270 at 11 (E.D.N.Y.1988); *Beighley v. FDIC*, 868 F.2d 776, 784 (5th Cir.1989); *Bell & Murphy v. Interfirst Bank*, 894 F.2d 750, 753–4 (5th Cir.1990). *Contra, Baumann v. Savers Federal Sav. & Loan Assoc.*, 934 F.2d 1506 (11th Cir.1991) relying on *Federal Sav. & Loan Ins. Corp. v. Gordy*, 928 F.2d 1558 (11th Cir.1991).

■ Precisely when a party may be considered to be one who "lent himself to a scheme", has not been defined and may not be subject to a clear-cut definition. What is clear, however, is that either intention to deceive, *Bell & Murphy v. Interfirst Bank*, 894 F.2d 750, 753 (5th Cir.1990), some degree of recklessness, *FDIC v. McClanahan*, 795 F.2d 512, 515 (5th Cir. 1986); *FSLIC v. Murray*, 853 F.2d 1251,

1255 (5th Cir.1988), or negligence, *FDIC v. Meo*, 505 F.2d 790, 793 (9th Cir.1974), is a prerequisite to invoking the D'Oench Duhme doctrine.

Some courts, though, have developed a line of reasoning that may be useful in applying the test. In *Campbell Leasing v. FDIC*, 901 F.2d 1244, 1248 (5th Cir.1990) the court held:

> "The doctrine thus 'favors the interests of depositors and creditors of a failed bank, *who cannot protect themselves* from secret agreements, over the interests of those who can' ... In this case the appellants were in a position to *protect themselves* by ensuring that the Lex Star transaction was adequately documented in Republic Bank's record."

See also, *Fair v. NCNB Texas Nat. Bank*, 733 F.Supp. 1099, 1103 (N.D.Tex.1990) citing *Chatham Ventures v. FDIC*, 651 F.2d. 355 (5th Cir. Unit B 1981), *reh. denied* 657 F.2d 1251, *cert. denied* 456 U.S. 972, 102 S.Ct. 2234, 72 L.Ed.2d 845 (1982).

Application of these principles clearly shows the inapplicability of the D'Oench Duhme doctrine herein. Simply stated, Woodstone did not lend itself to any scheme or arrangement that misled or was likely to mislead the regulatory agencies having authority over First Texas. The deal negotiated between Woodstone and First Texas was a good faith, ordinary course of business, type of a deal. From the facts before the court it is reasonable to assume that but for the institution of the receivership action, the papers would have been signed and placed in the Woodstone file. Even FGB does not argue that there was a secret agreement, secret understanding or the like. FGB argues that no agreement was reached. That, however, is a different question. It may well be that under Texas law, Woodstone has no contractual right to enforce the alleged "understanding". The question dealt with here, however, is a different one: assuming arguendo that Woodstone does have contractual rights under Texas law, is Woodstone barred from raising those rights due to the D'Oench Duhme shield? We think it is not.

Woodstone could not have done more than it actually did, in order to protect itself. The negotiations between Woodstone and First Texas were not hidden or secret. First Texas applied to the FHB–Dallas for approval of the "understanding" and after the regulatory approval was obtained, transmitted a request for the documents required for closing. Only then was the FSLIC appointed receiver and the negotiations came to a standstill. We do not see how a rule rooted in equitable grounds can be used to bar Woodstone in these circumstances. We hold, therefore, that the D'Oench Duhme shield is inapplicable to the dispute at bar.

The D'Oench Duhme decision was neither astounding nor novel. The decision was nothing more than an application of the ancient doctrine of equitable estoppel to new facts. As the D'Oench court clearly stated, its decision was based on *Deitrick v. Greaney*, 309 U.S. 190, 60 S.Ct. 480, 84 L.Ed. 694 (1940) *reh. denied* 309 U.S. 697, 60 S.Ct. 611, 84 L.Ed. 1036 (1940). *D'Oench Duhme*, 315 U.S. at 457–458, 62 S.Ct. at 679–80. As the *Deitrick* court stated:

> It is a principle of the widest application that equity will not permit one to rely on his own *wrongful act*, as against those affected by it who have not participated in it, to support his own asserted legal title or to defeat a remedy which except for his misconduct would not be available ... Applied in cases like the present, the rule that the illegal agreement may not be set up to defeat the obligation of the note is something denominated an *equitable estoppel*.

*Id.* at 196–197, 60 S.Ct. at 483 and the cases cited therein (emphasis added).

Even though the *Deitrick* court proceeds to state that the principle established by it differs from the equitable estoppel doctrine, that does not and should not negate the rationale and the legal foundation for the rule. However modified, the *Deitrick* court did not obviate the most basic element required for the application of the equitable estoppel doctrine, i.e., some type of misrepresentation or an unlawful or pro-

hibited behavior on account of the party to be estopped:

It is the *evil tendency* of the *prohibited acts* at which the statute is aimed ... *Id.* at 198–199, 60 S.Ct. at 484 (emphasis added). See also, *FDIC v. Aetna Casualty & Surety Company,* 947 F.2d at 202 (6th Cir.1991), "If Aetna was arguing that ... then the concerns that gave rise to the *equitable estoppel doctrine of D'Oench* and the subsequent enactment of section 1823(e) would be triggered." (emphasis added).

It appears, therefore, that the equitable prerequisites to the application of the D'Oench Duhme doctrine to the facts of this case are totally lacking. In light of the "lent himself to a scheme" requirement enunciated by D'Oench Duhme and the equitable foundation upon which it was predicated, we think this Circuit, as well as the Supreme Court, would not follow those Circuits decisions that expanded the doctrine beyond its originally stated limitations.

Even though not necessary for the disposition of this issue, we wish to note our doubts concerning the continued viability of the D'Oench Duhme doctrine:

(i) Courts are widely in agreement that 12 U.S.C. § 1823(e) (hereinafter "section 1823(e)") was enacted in response to D'Oench Duhme and that it is in fact a codification of the doctrine. See, *Carteret Sav. Bank v. Compton, Luther & Sons,* 899 F.2d 340, 343 (4th Cir.1990); *Bell & Murphy v. Interfirst Bank,* 894 F.2d 750, 753 (5th Cir.1990); *FSLIC v. Murray,* 853 F.2d 1251, 1254 (5th Cir.1988); *Gallant v. Kanterman,* 108 B.R. 432, 433 (S.D.N.Y.1989), 97 B.R. 768, 774 (Bankr. S.D.N.Y.1989); *FSLIC v. HSI,* 657 F.Supp. 1333, 1337 (E.D.La.1986); *FDIC v. MM & S Partners,* 626 F.Supp. 681, 683 (N.D.Ill. 1985). As a result a very strong case for preemption arises. For a solid presentation of the argument, see Gray, *Limitation on the FDIC's D'Oench Duhme Doctrine of Federal Common Law Estoppel: Congressional Preemption and Authoritative Statutory Construction,* 31 S.Tex.L.Rev.

245 (1990) (hereinafter "Gray") Part III, para. A(1) and (2). See also, Narcross, *The Bank Insolvency Game: FDIC Superpowers, The D'Oench Duhme doctrine and Federal Common Law,* 103 Banking L.J. 316, 328 (hereinafter "Narcross"). But *cf. FDIC v. McClanahan,* 795 F.2d 512, 514 fn. 1 (5th Cir.1986).

(ii) Cases rendered under the D'Oench Duhme doctrine enunciated a strong policy argument in support of it: federal regulators have to act quickly and swiftly in maintaining the failed banks operational in order to maintain public confidence in financial institutions. Therefore, the purchase and assumption transactions between the federal regulators and the purchasing bank are performed within a very short period of time; sometimes within a day. Federal regulators must be afforded the ability to determine the value of the failed bank's assets and liabilities solely from the papers available for its inspection. "The logic underlying this rule is simple: because of the important role that the FDIC and FSLIC play in insuring the fiscal integrity of the nation's financial institutions, and because this role must often be exercised quickly in the case of failed banks to avoid any interruption in normal banking services, the agencies must be able to rely on the written records of bank assets and liabilities to assess an institution's status." *FSLIC v. Master S.,* 1988 WL 127575 at 2, 1988 U.S.Dist.Lexis 13270 at 6 (E.D.N.Y.1988). See also, *Gunter v. Hutcheson,* 674 F.2d 862, 865 (11th Cir. 1982), *cert. denied* 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982), *reh. denied* 459 U.S. 1059, 103 S.Ct. 477, 74 L.Ed.2d 624 (1982); *Langley v. FDIC,* 484 U.S. 86, 90, 108 S.Ct. 396, 401, 98 L.Ed.2d 340 (1987).[3]

Lately, however, federal regulators have shown that they do not always need to act swiftly and immediately and that they can in fact act in a manner that will allow them a substantial amount of time for inspection. The federal regulators who seized the Bank of New England and its two affiliated banks in January, 1991, decided only in April, 1991 who would be the successful

---

**3.** Note, however, that both cases were decided under section 1823(e).

bidder to acquire the failed banks. See, Regulators Pick Buyer To Operate New England Bank, N.Y. Times, April 23, 1991, pp. A1 and D1. The regulators managed and operated the bank for at least three months with no apparent or reported detriment to the institutions involved or the financial infrastructure of the country.

(iii) By executing a purchase and assumption agreements under which the buyer can retain the "good" assets while the government retains the risk associated with "bad" assets, the federal regulators in effect ignore the statutory limited insurance, produce disincentives in the deposit placement marketplace and increase the level of risk carried by banks that may have a snowball effect on failures of banking institutions. See, *Narcross, supra* at 319–320.

## II. *12 U.S.C. § 1823(e)*

■ Notwithstanding the policy considerations and judicially developed exclusions to the D'Oench Duhme doctrine discussed above, section 1823(e) in its *current* form, would appear to bar Woodstone's arguments in support of its motion to reduce or expunge FGB's claim. The current version of section 1823(e), however, is not controlling in this case.

Prior to its amendment on August 9, 1989 by the Financial Institutions Reform, Recovery and Enforcement Act, Pub.L. No. 101–73, 103 Stat. 183 (1989) (hereinafter "Firrea Act"), section 1823(e) applied to the FDIC only in its corporate capacity and not in its receivership capacity. *See Bell & Murphy v. Interfirst Bank,* 894 F.2d 750, 753 (5th Cir.1990); *Beighley v. FDIC,* 868 F.2d 776, 783 (5th Cir.1989); *In re C.P.C. Dev. Co. No.5.,* 113 B.R. 637, 640 (Bankr. C.D.Cal.1990); *In re Kanterman,* 108 B.R. 432, 433 (S.D.N.Y.1989), 97 B.R. 768, 774 (Bankr.S.D.N.Y.1989). Furthermore, the section did not apply to FSLIC. See, *FSLIC v. HSI,* 657 F.Supp. 1333, 1338 (E.D.La.1986) ("Of course, § 1823(e) is not binding here even though the common law of D'Oench is ... By its terms, the statute only applies to the FDIC"); *Carteret Sav. Bank v. Compton, Luther & Sons,* 899 F.2d 340, 343 (4th Cir.1990) ("Although the

U.S.Code section only codified the D'Oench rule with regards to the FDIC, other circuit courts continue to apply it [the D'Oench doctrine] to situations involving the FSLIC"); *FSLIC v. Murray,* 853 F.2d 1251, 1254 (5th Cir.1988) ("Congress codified the D'Oench holding for FDIC acting in its corporate capacity. 12 U.S.C. § 1823(e). While neither Congress nor the Supreme Court has extended these protections to FSLIC, we see no reason to treat these regulatory authorities differently. We agree with the Sixth Circuit that the *D'Oench and its progeny extends these protections to FSLIC"*) (emphasis added); *Porras v. Petroplex Sav. Assn.,* 903 F.2d 379 (5th Cir.1990) ("In *Murray,* this court applied the D'Oench Duhme doctrine to protect the FSLIC against secret agreements", *Id.* at 380 and "[e]xtending D'Oench Duhme to transferees of assets from the FSLIC, therefore, provides the FSLIC with greater opportunity to protect the failed institutions assets"), *Id.* at 381. *Cf., Firstsouth v. Aqua Construction, Inc.,* 858 F.2d 441, 443 (8th Cir.1988).

However, we do not believe that this Circuit would agree with this judicial expansion of section 1823(e) protections to the FSLIC. "[T]here is no parallel provision for the FSLIC matching the FDIC's section 1823(e) codification of D'Oench anywhere in the two sections of the Garn–St. Germain Act dealing with the two agencies' new and expanded powers to assist troubled institutions. The FDIC's use of D'Oench protection, as enacted in section 1823(e), is characterized as an essential part of its ability to conduct purchase and assumption transactions and the required evaluation of bank assets and liabilities. The failure to include the FSLIC within the ambit of section 1823(e) or a similar statute, when that agency was assigned purchase and assumption powers and responsibilities identical to the FDIC's creates '[t]he presumption that (the) remedy was deliberately omitted from (the) statute' ... 'although a federal court may disagree with the regulatory approach taken ... such disagreement alone is no basis for the creation of federal common law.'" *Gray, supra,* part III(A)(2) (footnotes omitted).

Since section 1823(e) prior to its amendment by the Firrea Act did not apply to the FSLIC and since section 1823(e) as amended by the Firrea Act cannot be applied retroactively, see *Gray, supra* part IV(A)(1)(a)(4) and cases cited therein, we conclude that section 1823(e) does not render the modification agreement unenforceable as a matter of federal law.

We are not unaware, however, of what appears to be an emerging trend holding that section 1823(e), as amended by the Firrea Act, applies retroactively. See *In re Francis X. Queen*, 129 B.R. 5 (Bankr. D.N.H.1991); *FDIC v. Engel*, 746 F.Supp. 1223 (S.D.N.Y.1990); *RTC v. Dismuke*, 746 F.Supp. 104 (N.D.Ga.1990); *FDIC v. Sullivan*, 744 F.Supp. 239 (D.Colo.1990); *FDIC v. British American Corp.*, 744 F.Supp. 116 (E.D.N.C.1990); *FDIC v. Carter*, 1990 WL 209626 (W.D.Okla.1990); *FDIC v. Dalba*, 1990 WL 43750 (W.D.Wis.1990). This court however is not persuaded by the reasoning of these cases and does not believe that this Circuit would adopt their reasoning. These cases relied on *Bradley v. School Board of City of Richmond*, 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974). The *Bradley* decision, however, is considered an exception to the general rule of construction disfavoring the retroactive application of statutory legislation. See, *Litton Systems Inc. v. AT & T*, 746 F.2d 168 (2d Cir.1984). See, e.g., *Bowen v. Georgetown University Hospital*, 488 U.S. 204, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988); *Kaiser Aluminum Corp. v. Bonjorno*, 494 U.S. 827, 110 S.Ct. 1570, 108 L.Ed.2d 842 (1990); *Orrego v. 833 West Buena Joint Venture*, 943 F.2d 730 (7th Cir.1991).

Moreover, this is not a case where the court has to engage in a great effort to determine Congressional intent. Congress made its intention known "loud and clear" in 1950 by not extending section 1823(e) to the FDIC in its capacity as a receiver and to the FSLIC in either capacity, and further, by not extending it to the FSLIC while it made substantial and comprehensive changes to Title 12 in 1982. It seems rather illogical to argue that even though Congress refrained from making these changes for a period of 39 years, when it finally did, it intended to apply these changes retroactively.

### III. *The Federal Holder in Due Course Doctrine*

Some federal courts apparently have felt that the protections provided to the FDIC and FSLIC by the D'Oench Duhme doctrine and to the FDIC in section 1823(e) are insufficient. These courts have therefore developed an additional theory designed to further protect the public funds which these agencies are designed to insure. This doctrine resulted in the establishment of a federal holder in due course status for the FDIC and the FSLIC. See, *Gunter v. Hutcheson*, 674 F.2d 862 (11th Cir.1982), *cert. denied* 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982); *FDIC v. Wood*, 758 F.2d 156 (6th Cir.1985), *cert. denied* 474 U.S. 944, 106 S.Ct. 308, 88 L.Ed.2d 286 (1985). See also, *Bell & Murphy v. Interfirst Bank*, 894 F.2d 750 (5th Cir.1990); *Campbell Leasing v. FDIC*, 901 F.2d 1244 (5th Cir.1990); *Porras v. Petroplex Sav. Assn.*, 903 F.2d 379 (5th Cir. 1990); *FSLIC v. Murray*, 853 F.2d 1251 (5th Cir.1988); *CTS Truss v. FDIC*, 859 F.2d 357 (5th Cir.1988); *B.L. Nelson & Assoc., Inc. v. Sunbelt Savings*, 733 F.Supp. 1106 (N.D.Tex.1990); *FDIC v. MM & S Partners*, 626 F.Supp. 681 (N.D.Ill. 1985). None of these cases, however, have examined the federal holder in due course in light of the preemption doctrine. We believe that by enacting section 1823(e) Congress has preempted the authority of the judiciary to further develop this doctrine and therefore we decline to follow those cases which attempt to do so.

(i) These can be no doubt that federal law applies to the dispute at bar. *D'Oench Duhme*, 315 U.S. 447, 62 S.Ct. 676; *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979); *FDIC v. Wood*, 758 F.2d 156 (6th Cir.1985). Courts, however, are authorized to fashion federal law applicable to federal programs only when the statutes establishing these programs are silent with regard to the applicable rule of decision:

"That the statutes authorizing these federal lending programs do not specify the appropriate rule of decision in no way limits the reach of federal law. It is precisely when Congress has not spoken 'in an area comprising issues substantially related to an established program of government operations' ... that Clearfield directs federal courts to fill the interstices of federal legislation 'according to their own standards.' *Clearfield Trust Co. v. United States*, 318 U.S. [363] at 367, 63 S.Ct. [573] at 575 [87 L.Ed. 838 (1943)]."

*Kimbell Foods Inc.*, 99 S.Ct. at 1458.

The Supreme Court reiterated this principle again only two years later:

"Federal common law is a 'necessary expedient', and when Congress addresses a question previously governed by a decision rested on federal common law the need for such an unusual exercise of lawmaking by federal courts disappears."

*Milwaukee v. Illinois*, 451 U.S. 304, 314, 101 S.Ct. 1784, 1791, 68 L.Ed.2d 114 (1981).

■ Since the Federal Deposit Insurance Act of 1950, ch. 967, 64 Stat. 873 (1950) and the Garn–St. Germain Depository Institutions Act of 1982, Pub.L. No. 97–320, 96 Stat. 1469 (1982), are both comprehensive statutes that created and amended the federal banking and thrift regulatory framework, the federal holder in due course status cannot be afforded to the FDIC, because the comprehensive regulatory legislation explicitly provided for a federal rule of decision as required by *Kimbell Foods*.

■ Furthermore, the doctrine may not be applied for the benefit of FSLIC on two grounds: First, "because the Federal Deposit Insurance Act of 1950 was a comprehensive statute that did not include the FSLIC within the codification of D'Oench in section 2(13)(e) [12 U.S.C. § 1823(e)], 'we [could] presume that Congress deliberately omitted the asserted remedy.'" *Gray, supra*, part III(A)(1) citing *Barany v. Buller*, 670 F.2d 726, 736 (7th Cir.1982). Second,

"the Garn–St. Germain [Garn St. Germain Depository Institutions Act of 1982, Pub.L. No. 97–320, 96 Stat. 1469 (1982)] ... is a comprehensive regulatory legislation affecting both the banking and thrift industries ... When Congress chose to tinker with the statutory protection afforded to the FDIC in section 1823(e) without granting the same fundamental protection to the FSLIC *in parallel legislation embodied in the same comprehensive bill*, a presumption arises that Congress deliberately omitted giving D'Oench protection to the FSLIC." See *Gray, supra*, part III(A)(2) (emphasis added). When Congress deliberately denied the FSLIC the protection of section 1823(e), courts are not at liberty to provide it under the guise of federal common law.

■ In *Gunter v. Hutcheson*, 674 F.2d 862 (11th Cir.1982) and *FDIC v. Wood*, 758 F.2d 156 (6th Cir.1985) the Eleventh and the Sixth Circuits misapplied *Kimbell Foods*. As the *Wood* court stated: "[a]s federal common law is applicable, but Congress has given no statutory guidance, we are faced with the same problem of giving content to federal law that the Supreme Court faced in *United States v. Kimbell Foods*." *Wood*, 758 F.2d at 159. The *Wood* court developed the federal holder in due course doctrine since the FDIC, sued in its corporate capacity, was not afforded section 1823(e) protection at that time (prior to the Firrea Act). The *Gunter* court had developed the doctrine since it found section 1823(e) inapplicable to the type of claims asserted. This rationale is a complete circumvention of section 1823(e) and the Congressional intent manifested thereby.[4] Here, in contrast to the *Kimbell Foods* situation, Congress has given clear statutory guidance regarding its intent. We believe that a correct reading of section 1823(e) and case law on preemption, mandates a conclusion that whenever the FDIC or the FSLIC cannot be afforded the protection of section 1823(e), state law should apply. Section 1823(e), as enacted in 1950 and as amended in 1982, and further

---

4. The Court of Appeals for the Sixth Circuit presented some of the criticism on its *Wood* decision in *FDIC v. Aetna Casualty & Surety Company*, 947 F.2d 196, 204 fn. 5 (6th Cir.1991).

amended in 1989 (the later amendment does not apply herein), is a clear Congressional mandate as to when a uniform federal law should apply as well as the limits of such an application. See *Milwaukee v. Illinois*, 451 U.S. 304, 101 S.Ct. 1784; *Gray, supra*, part III(A)(1).

We agree therefore that "[t]he legislative history clearly indicates section 1823(e) was not intended to accord HDC [holder in due course] status to any of these players, and there is no basis in the opinion or policy of D'Oench, given the Congressional response to it, to extend it to create HDC status." *Miller & Meachen*, 40 Okla. L.Rev. 621, 632–33 (1987).

(ii) In *Langley v. FDIC*, 484 U.S. 86, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987) the Supreme Court held that an oral misrepresentation made by a bank's president concerning the loan term and property to be purchased, came within the ambit of "agreement" in section 1823(e). We should note, however, that even though the application of the federal holder in due course would have been dispositive of the issue, the doctrine is not mentioned at all. Also, when the court addressed the petitioners fall back position, the court analyzed it under the prevailing rules of the Uniform Commercial Code, again making no reference to the federal holder in due course doctrine.

(iii) The policy arguments advanced by the *Gunter* and *Wood* courts in establishing the doctrine, which in essence serves as the rationale for both D'Oench Duhme and section 1823(e), are not persuasive as a basis for an additional, a third doctrine seeking to protect the FDIC and FSLIC. Acknowledging the existence of such a doctrine would create an absolute immunity for these entities against almost any type of defense other than real defenses. There is nothing in the statutory language, the legislative history or the case law that provides a basis for so immunizing the FDIC and the FSLIC nor is there any policy argument that appears to justify it. "While the desirability of a uniform law is clear, this does not mean that the rule need be one of immunity from valid state law defenses. To apply the UCC rule would be

to apply a uniform rule; it would not detract from FDIC policy; it would not disrupt existing relationships under state law; and it would bring the law in this area into line with the overwhelming weight of authority concerning the rights of the United States on commercial paper in other contexts where, almost without exception, the UCC rule is followed. Indeed, the better economic policy also would be served; subjecting the FDIC to such defenses would promote market discipline within the banking system as a whole." *Miller & Meachen, supra*.

(iv) In extending and expanding the D'Oench rule, section 1823(e) and the federal holder in due course doctrine, courts reasoned that safeguards were necessary to maximize the value of the assets of the failed institution. There are voices, however, that argue that the mechanism used by these agencies pursuant to current legislation and case law, increases the likelihood of bank and thrift failures and therefore increases the exposure of the insurance funds.

A P & A [purchase and assumption] transaction, in effect, ignores the statutory insurance limits and, consequently, has evolved through corresponding case law to the extent that de facto one hundred percent coverage is provided. This result produces disincentives in the deposit placement marketplace; as large depositors are driven to large banks, any perception of bank risk is removed from business decisions, funds placement becomes totally yield driven and market discipline erodes. Because the tendency to use a P & A transaction is compounded as bank size increases, large depositors in large banks receive more protection than large depositors in small banks. *With the element of risk evaluation eliminated from the deposit placement decision, bankers compete to offer the highest deposit yield to attract the necessary funds to reach that 'magical' threshhold of 100 percent insurance. To offer competitively high yields on deposit accounts, bankers must accept more risk in the management of their assets ... Thus, the overall level of risk*

*incurred by the banking system snowballs, and the potential for crisis failure multiplies.*

*Narcross, supra* at 319–20 (emphasis added).

(v) Although courts have adopted the federal holder in due course doctrine for the sake of national uniformity the doctrine is, unfortunately, far from being applied in a uniform manner. In *FDIC v. Wood,* 758 F.2d at 161, the court specifically would "express no opinion whether we would give the FDIC preferential treatment in other contexts", in light of *FDIC v. Gulf Life Insurance Co.,* 737 F.2d 1513 (11th Cir. 1984), *reh. denied en banc* 749 F.2d 733 (11th Cir.1984) which allowed the FDIC to collect unearned premium refunds notwithstanding defenses of waiver, estoppel and unjust enrichment.

In *FSLIC v. Murray,* 853 F.2d at 1257, the court conferred upon the FSLIC a holder in due course status under federal common law but stated that the defenses allowed against it would be based upon the "model Uniform Commercial Code ... and to 'those cases which best supplement the UCC and further its purpose and design.'" Such a vague guideline invites the problems inherent in diverse interpretation; it does nothing to avoid them.

In *B.L. Nelson & Assoc., Inc. v. Sunbelt Savings,* 733 F.Supp. 1106 (N.D.Tex.1990) the court held that the FSLIC must acquire the assets in good faith and without actual knowledge of the defenses. The *Wood* court, 758 F.2d at 162, however, applied a different time standard when it held that the "actual knowledge must be shown as of the date the FDIC entered into the purchase and assumption agreement." Thus, even though the doctrine is ostensibly applied to achieve the goal of uniformity, the manner in which it is applied by those courts which have adopted it, belie its stated purpose.

██ We decline, therefore, to confer upon FGB the status of a federal holder in due course. As a result, none of the three lines of decision that might have been urged as beneficial to FGB are applicable. Consistent with the reasoning of the *Kim-*

*bell Foods* court, we find state law to be controlling. See also, *FDIC v. Braemoor Associates,* 686 F.2d 550 (7th Cir.1982) *cert. denied* 461 U.S. 927, 103 S.Ct. 2086, 77 L.Ed.2d 297 (1983); *Landmark Land Co. v. Sprague,* 529 F.Supp. 971 (S.D.N.Y.1981), *rev'd on other grounds,* 701 F.2d 1065 (2d Cir.1983).

## IV. *Texas State Law*

Since Woodstone might prevail if it were able to establish the existence of both the facts and the state law upon which rest the arguments discussed below, dismissal of Woodstone's objections to FGB's claim is premature.

FGB did not contest, though did not expressly concede, that the negotiations between the parties concluded in an "understanding" regarding the acceptable terms for an agreement to modify the initial loan agreement. FGB argues, however, that the "understanding" did not mature into an enforceable agreement since:

(a) First Texas clearly and explicitly required that no agreement would be valid unless and until a written agreement was executed;

(b) Woodstone did not meet the terms of the "understanding", i.e., did not make the required payments or deliver the required letter of credit;

(c) The statute of frauds prohibits the enforceability of the alleged agreement.

We reject these arguments as follows:

(a) First Texas' intent to be bound only by a written agreement.

██ There is no doubt that during most of the negotiation process, First Texas clearly indicated that it would be bound only by a written agreement. The arguments advanced by Woodstone, however, indicate that First Texas might have waived this requirement upon the approval granted by FHB Dallas. Under Texas law a party can waive orally the requirement to be bound by a written document. See *Manning v. Barnard,* 277 S.W.2d 160 (Tex. Civ.App.1955); *Gulf Production Co. v.*

*Continental Oil Co.,* 139 Tex. 183, 164 S.W.2d 488 (1942).

While Woodstone argues that FHB Dallas did approve the alleged modification agreement, FGB disagrees. This issue, however, cannot be disposed of based on the briefs and should be the subject of an evidentiary hearing.

### (b) Woodstone Did Not Meet the Terms of the "Understanding".

■■ Implicit in this argument is the proposition that an agreement, oral or written, was in fact reached. The court is unable, based on the briefs and without hearing testimony, to determine whether or not the agreement was in fact breached. For this reason, the court cannot assess the damages, if any, that accrued to FGB.

### (c) Statute of Frauds.

■■ The court rejects Woodstone's argument that the loan agreement was not subject to Texas' Statute of Frauds prior to September 1, 1991, when section 26.02 was added to Texas' Business and Commerce Code. 4 V.T.C.A. § 26.02 (1987 and 1991 Supp.). Certain loan agreements that meet the requirements of § 26.02 were made explicitly subject to the Statute of Frauds by this amendment. It appears, however, that even prior to the effective date of § 26.02, loan agreements that met the requirements of § 26.01(b)(6), i.e., "an agreement which is not to be performed within one year from the date of making the agreement", were subject to the Statute of Frauds. See, e.g., *Harlen v. Pfeffer,* 693 S.W.2d 543 (Tex.Ct.App.1985); *Foster v. Mutual Savings Association,* 602 S.W.2d 98 (Tex.Civ. App.1980).

Woodstone, however, is entitled to an opportunity to argue and prove that the "understanding" was not subject to the Statute of Frauds when made, or that even if it was, the "understanding" meets the writing requirement of the statute or that it can evade the application of the statute:

■■ (i) The "writing" requirement of the Statute of Frauds does not require the existence of one single document which embodies all the necessary details of the agreement. It is sufficient if the contract can be made out from any writings and from one's correspondence. The requirement may be satisfied by a series of letters. See *Central Power & Light Co. v. Del Mar Conservation District,* 594 S.W.2d 782 (Tex.Civ.App.1980); *Howell v. Bowden,* 368 S.W.2d 842 (Tex.Civ.App. 1963); *Schawe v. Giles,* 55 S.W.2d 588 (Tex.Civ.App.1932); *Black v. Hanz,* 146 S.W. 309 (Tex.Civ.App.1912); *Peters v. Phillips,* 19 Tex. 70 (1857). Without the benefit of an evidentiary hearing we cannot determine whether Woodstone may or may not prevail based on such an argument.

■■ (ii) The general rule is that the Statute of Frauds does not apply to contracts where one can fully perform within one year of making the agreement, even though the other cannot. See *Tyler v. St. Louis S.R. Co.,* 91 S.W. 1, 99 Tex. 491 (1906), *mod. on other grounds and reh. denied* 93 S.W. 997, *error dism'd* 212 U.S. 552, 29 S.Ct. 684, 53 L.Ed. 649 (1908); *Brazee v. Woods,* 35 Tex. 302 (1871); *Miller v. Roberts,* 18 Tex. 16 (1856). The court did not examine and analyze the agreement. Nor did the parties. Woodstone, however, should have the opportunity to argue and establish that First Texas, as the maker of the loan, performed all or substantially all of its obligations under the agreement within one year of making it.

(iii) "The rule in Texas is that a contract in writing signed by one party and expressly accepted orally by the other, or the terms thereof performed and the benefits thereof accepted, is in law the written contract of the parties and binding on both." *Rubin v. Polunsky,* 366 S.W.2d 234 (Tex. Civ.App.1963). See also, *Ford v. Culbertson,* 158 Tex. 124, 308 S.W.2d 855 (1958); *Reeves Furniture v. Simms,* 59 S.W.2d 262 (Tex.Civ.App.1933); *Sorrells v. Goldberg,* 34 Tex.Civ.App. 265, 78 S.W. 711 (1904); 2 Corbin on Contracts § 524 (1950 & 1991 Supp.). Without the benefit of an evidentiary hearing, the court cannot determine the extent to which such an argument can successfully be made.

■■ (iv) Part performance may take an oral agreement out of the Statute of

Frauds. See *Anderson v. Paschall,* 60 S.W.2d 1087 (Tex.Civ.App.1933), *aff'd* 127 Tex. 251, 91 S.W.2d 1050 (1936); *Walker v. Lorehn,* 355 S.W.2d 71 (Tex.Civ.App.1962); *Francis v. Thomas,* 129 Tex. 579, 106 S.W.2d 257 (1937).

■■■ (v) Even if a contract is subject to the Statute of Frauds, changes which are not material, including changes relating to the method of payment and mode of performance, can be made orally without running afoul of the Statute of Frauds. See *Garcia v. Karam,* 154 Tex. 240, 276 S.W.2d 255 (1955); *Harlen v. Pfeffer,* 693 S.W.2d 543 (Tex.Ct.App.1985); *Manning v. Barnard,* 277 S.W.2d 160 (Tex.Civ.App.1955); 2 Corbin on Contracts § 304 at 99 (1950 & 1991 Supp.).

(vi) There seem to be conflicting authorities in Texas regarding modifications of only some portions of an agreement subject to the Statute of Frauds. Some authorities hold that the question depends on whether the modified portion is required by itself, to be in writing. These authorities hold that if neither the modified portion of the written contract, nor the matter encompassed by the modification itself is required by the Statute of Frauds to be in writing, the oral modification may be valid. See *Harlen v. Pfeffer,* 693 S.W.2d 547 (Tex.Ct.App.1985); 41 Tex.Jur.3d § 95 at 578. *Contra,* see *Kistler v. Latham,* 255 S.W. 983 (Tex.Com. App.1923); *Ickert v. Minor,* 22 S.W.2d 741 (Tex.Civ.App.1929).

■■■ (vii) Woodstone should have the opportunity to avoid the harsh effects of the Statute of Frauds based on promissory estoppel. The doctrine is part of Texas law and the factual elements a party must establish in order to prevail are clearly set forth in Texas' case law. See *"Moore" Burger Inc. v. Phillips Petroleum Co.,* 492 S.W.2d 934 (Tex.1972); *Cooper Petroleum Co. v. La Gloria Oil & Gas Co.,* 436 S.W.2d 889 (Tex.1969); *Texarkana Construction Co. v. Alpine Construction,* 489 S.W.2d 941 (Tex.Civ.App.1972).

■■■ (viii) Woodstone may advance the equitable estoppel doctrine which is part of Texas law as well. See *Texas Co. v. Burk-*

*ett,* 117 Tex. 16, 296 S.W. 273 (1927); *Duke v. Joseph,* 213 S.W.2d 535 (Tex.Civ.App. 1948); but for a very narrow reading of the doctrine, see *Reynolds v. Stevens Studios,* 659 F.2d 44 (5th Cir.1981).

(ix) The public policy behind the Statute of Frauds may not require the application of the statute to the facts herein. The Statute of Frauds is not by itself a goal slavishly to be followed; it is a tool designed to advance worthy causes: to safeguard the integrity of written contracts, to provide for clear evidence regarding the agreed upon terms, to prevent fraud and perjury, and the list is not exhaustive. See *Wilt v. Kellogg,* 99 S.W.2d 664 (Tex.Civ. App.1936), *aff'd* 132 Tex. 345, 122 S.W.2d 1051; *Adams v. Abbott,* 151 Tex. 601, 254 S.W.2d 78 (1952); 2 Corbin on Contracts § 225 (1950 & 1991 Supp.) Here, however, FGB does not contest the terms of the "understanding" between the parties. FGB argues that Woodstone did not meet the terms of the "understanding" and that conditions precedent to the validity of the "understanding" did not materialize; these arguments have nothing to do with the public policy behind the Statute of Frauds and the purposes which it was designed to serve.

## CONCLUSIONS

(1) Woodstone's objection to FGB's claim is not barred by the D'Oench Duhme doctrine, by section 1823(e), or by the federal holder in due course doctrine.

(2) Assuming, as we must for purposes of a motion to dismiss for failure to state grounds upon which relief may be granted, that Woodstone may be able to establish the factual underpinnings of its position, it is premature to dismiss Woodstone's objections to FGB's claim without a full evidentiary hearing.

Woodstone is directed to settle an order on ten (10) days' notice in accordance with the foregoing.